# FORM 10-K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2015**

**Commission File Number: 001-34139**

# Federal Home Loan Mortgage Corporation

*(Exact name of registrant as specified in its charter)*

### Freddie Mac

| | | | |
|---|---|---|---|
| **Federally chartered corporation** | **8200 Jones Branch Drive** | **52-0904874** | **(703) 903-2000** |
| *(State or other jurisdiction of incorporation or organization)* | **McLean, Virginia 22102-3110** | *(I.R.S. Employer Identification No.)* | *(Registrant's telephone number, including area code)* |
| | *(Address of principal executive offices, including zip code)* | | |

**Securities registered pursuant to Section 12(b) of the Act: None**

**Securities registered pursuant to Section 12(g) of the Act:**

Voting Common Stock, no par value per share (OTCQB: FMCC)
Variable Rate, Non-Cumulative Preferred Stock, par value $1.00 per share (OTCQB: FMCCI)
5% Non-Cumulative Preferred Stock, par value $1.00 per share (OTCQB: FMCKK)
Variable Rate, Non-Cumulative Preferred Stock, par value $1.00 per share (OTCQB: FMCCG)
5.1% Non-Cumulative Preferred Stock, par value $1.00 per share (OTCQB: FMCCH)
5.79% Non-Cumulative Preferred Stock, par value $1.00 per share (OTCQB: FMCCK)
Variable Rate, Non-Cumulative Preferred Stock, par value $1.00 per share (OTCQB: FMCCL)
Variable Rate, Non-Cumulative Preferred Stock, par value $1.00 per share (OTCQB: FMCCM)
Variable Rate, Non-Cumulative Preferred Stock, par value $1.00 per share (OTCQB: FMCCN)
5.81% Non-Cumulative Preferred Stock, par value $1.00 per share (OTCQB: FMCCO)
6% Non-Cumulative Preferred Stock, par value $1.00 per share (OTCQB: FMCCP)
Variable Rate, Non-Cumulative Preferred Stock, par value $1.00 per share (OTCQB: FMCCJ)
5.7% Non-Cumulative Preferred Stock, par value $1.00 per share (OTCQB: FMCKP)
Variable Rate, Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTCQB: FMCCS)
6.42% Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTCQB: FMCCT)
5.9% Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTCQB: FMCKO)
5.57% Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTCQB: FMCKM)
5.66% Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTCQB: FMCKN)
6.02% Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTCQB: FMCKL)
6.55% Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTCQB: FMCKI)
Fixed-to-Floating Rate Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTCQB: FMCKJ)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes [ ] No [X]

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes [ ] No [X]

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [X]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer  [ X ] | Accelerated filer [ ] |
| Non-accelerated filer (Do not check if a smaller reporting company)  [ ] | Smaller reporting company  [ ] |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes [ ] No [X]

The aggregate market value of the common stock held by non-affiliates computed by reference to the price at which the common equity was last sold on June 30, 2015 (the last business day of the registrant's most recently completed second fiscal quarter) was $1.4 billion.

As of February 4, 2016, there were 650,045,962 shares of the registrant's common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**: None

# TABLE OF CONTENTS

|  | Page |
|---|---|
| INTRODUCTION | 1 |
| ABOUT FREDDIE MAC | 1 |
| EXECUTIVE SUMMARY | 1 |
| OUR BUSINESS | 5 |
| FORWARD-LOOKING STATEMENTS | 8 |
| SELECTED FINANCIAL DATA | 10 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 11 |
| KEY ECONOMIC INDICATORS | 11 |
| CONSOLIDATED RESULTS OF OPERATIONS | 14 |
| CONSOLIDATED BALANCE SHEETS ANALYSIS | 28 |
| OUR BUSINESS SEGMENTS | 30 |
| RISK MANAGEMENT | 84 |
| SINGLE-FAMILY MORTGAGE CREDIT RISK | 90 |
| MULTIFAMILY MORTGAGE CREDIT RISK | 117 |
| MORTGAGE-RELATED SECURITIES CREDIT RISK | 123 |
| LIQUIDITY AND CAPITAL RESOURCES | 148 |
| CONSERVATORSHIP AND RELATED MATTERS | 157 |
| REGULATION AND SUPERVISION | 163 |
| CONTRACTUAL OBLIGATIONS | 170 |
| OFF-BALANCE SHEET ARRANGEMENTS | 172 |
| CRITICAL ACCOUNTING POLICIES AND ESTIMATES | 174 |
| RISK FACTORS | 176 |
| LEGAL PROCEEDINGS | 200 |
| MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES | 201 |
| FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 204 |
| CONTROLS AND PROCEDURES | 331 |
| DIRECTORS, CORPORATE GOVERNANCE, AND EXECUTIVE OFFICERS | 335 |
| DIRECTORS | 335 |
| CORPORATE GOVERNANCE | 345 |
| EXECUTIVE OFFICERS | 353 |
| EXECUTIVE COMPENSATION | 356 |
| COMPENSATION DISCUSSION AND ANALYSIS | 356 |
| COMPENSATION AND RISK | 372 |
| 2015 COMPENSATION INFORMATION FOR NEOs | 373 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 380 |
| CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 383 |
| PRINCIPAL ACCOUNTING FEES AND SERVICES | 386 |
| EXHIBITS AND FINANCIAL STATEMENT SCHEDULES | 388 |
| SIGNATURES | 389 |
| GLOSSARY | 392 |
| FORM 10-K INDEX | 404 |
| EXHIBIT INDEX | E-1 |

# INTRODUCTION

*This Annual Report on Form 10-K includes forward-looking statements that are based on current expectations and are subject to significant risks and uncertainties. These forward-looking statements are made as of the date of this Form 10-K. We undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date of this Form 10-K. Actual results might differ significantly from those described in or implied by such statements due to various factors and uncertainties, including those described in the "ABOUT FREDDIE MAC - Forward-Looking Statements" and "RISK FACTORS" sections of this Form 10-K.*

*Throughout this Form 10-K, we use certain acronyms and terms that are defined in the "GLOSSARY."*

## ABOUT FREDDIE MAC

Freddie Mac is a GSE chartered by Congress in 1970. Our public mission is to provide liquidity, stability, and affordability to the U.S. housing market. We do this primarily by purchasing residential mortgage loans originated by lenders. In most instances, we package these loans into mortgage-related securities, which are guaranteed by us and sold in the global capital markets. We also invest in mortgage loans and mortgage-related securities. We do not originate loans or lend money directly to consumers.

We support the U.S. housing market and the overall economy by enabling America's families to access mortgage loan funding at lower rates and by providing consistent liquidity to the multifamily mortgage market, which we do primarily by providing financing for workforce housing. We have helped many distressed borrowers keep their homes or avoid foreclosure. We are working with FHFA, our customers and the industry to build a stronger housing finance system for the nation.

## EXECUTIVE SUMMARY

### CONSERVATORSHIP AND GOVERNMENT SUPPORT FOR OUR BUSINESS

Since September 2008, we have been operating in conservatorship, with FHFA acting as our Conservator. The conservatorship and related matters significantly affect our management, business activities, financial condition, and results of operations. Our future is uncertain, and the conservatorship has no specified termination date. We do not know what changes may occur to our business model during or following conservatorship, including whether we will continue to exist.

Our Purchase Agreement with Treasury and the terms of the senior preferred stock we issued to Treasury constrain our business activities. However, we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to have adequate liquidity to conduct our normal business activities. The Purchase Agreement also requires our future profits to effectively be distributed to Treasury, and we cannot retain capital from the earnings generated by our business operations (other than a limited amount that will decrease to zero in 2018) or return capital to stockholders other than Treasury. Consequently, our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent and avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions.

For more information on the conservatorship and government support for our business, see "Conservatorship and Related Matters" and Note 2.

The tables below show our cumulative draws from Treasury and cumulative dividend payments to Treasury under the Purchase Agreement. The Treasury draw amounts shown are the total draws requested based on our quarterly net deficits for the periods presented. Draw requests are funded in the quarter subsequent to any net deficit. Under the Purchase Agreement, the payment of dividends does not reduce the outstanding liquidation preference of the senior preferred stock, which remains $72.3 billion. The amount of available funding remaining under the Purchase Agreement is $140.5 billion, and would be reduced by any future draws.

### Draws From Treasury

| (in billions) | | Total |
|---|---|---|
| Total Senior Preferred Stock Outstanding | $ | 72.3 |
| Less: Initial Liquidation Preference | $ | 1.0 |
| Treasury Draws | $ | 71.3 |



Draw requests from Treasury

### Dividend Payments to Treasury

| (In billions) | | Total |
|---|---|---|
| Dividend Payments as of 12/31/15 | $ | 96.5 |
| Q1 2016 Dividend Obligation | $ | 1.7 |
| Total Dividend Payments | $ | 98.2 |



Dividend payments to Treasury

## MORTGAGE LOANS AND MORTGAGE-RELATED SECURITIES

We invest principally in mortgage loans and mortgage-related securities, certain categories of which are largely unencumbered and liquid. Our primary source of liquidity among these mortgage assets is our holdings of single-class and multiclass agency securities, excluding certain structured agency securities collateralized by non-agency mortgage-related securities.

In addition, we hold unsecuritized single-family loans and multifamily held-for-sale loans that could be securitized and would then be available for sale or use as collateral for repurchase agreements. Due to the large size of our portfolio of liquid assets, the amount of mortgage-related assets that we may successfully sell or borrow against in the event of a liquidity crisis or significant market disruption is substantially less than the amount of mortgage-related assets we hold. There would likely be insufficient market demand for large amounts of these assets over a prolonged period of time, which would limit our ability to sell or borrow against these assets.

We hold other mortgage assets, but given their characteristics, they may not be available for immediate sale or able to be used as collateral for repurchase agreements. These assets consist of certain structured agency securities collateralized by non-agency mortgage-related securities, CMBS, non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans, and unsecuritized seriously delinquent and modified single-family loans.

We are subject to limits on the amount of mortgage assets we can sell in any calendar month without review and approval by FHFA and, if FHFA so determines, Treasury.

## CASH FLOWS

Cash and cash equivalents decreased $5.3 billion to $5.6 billion during 2015, as compared to a decrease of $0.4 billion to $10.9 billion during 2014 and an increase of $2.8 billion to $11.3 billion during 2013. Cash flows used in operating activities during 2015 were primarily driven by increased net purchases of held-for-sale mortgage loans. Cash flows used in operating activities during 2015 were $0.9 billion. Cash flows provided by operating activities during 2014 and 2013 were $8.9 billion and $16.6 billion, respectively, primarily driven by cash proceeds from net interest income and non-agency mortgage-related securities settlements. Cash flows provided by investing activities during 2015, 2014, and 2013 were $179.0 billion, $205.3 billion, and $391.3 billion, respectively, primarily resulting from net proceeds received as a result of repayments of single-family held-for-investment mortgage loans. Cash flows used for financing activities during 2015, 2014, and 2013 were $183.3 billion, $214.5 billion, and $405.0 billion, respectively, primarily driven by net funds used to repay or redeem debt securities of consolidated trusts held by third parties and other debt.

## CAPITAL RESOURCES

Our entry into conservatorship resulted in significant changes to the assessment of our capital adequacy and our management of capital. Since our entry into conservatorship, Treasury and FHFA have taken a number of actions that affect our cash requirements and our ability to fund those requirements. Under the Purchase Agreement, Treasury made a commitment to provide us with funding, under certain conditions, to eliminate deficits in our net worth. Obtaining funding from Treasury pursuant to its commitment under the Purchase Agreement enables us to avoid being placed into receivership by FHFA. The amount of

available funding remaining under the Purchase Agreement is $140.5 billion. This amount will be reduced by any future draws.

At December 31, 2015, our assets exceeded our liabilities under GAAP; therefore no draw is being requested from Treasury under the Purchase Agreement. Based on our Net Worth Amount at December 31, 2015 and the 2016 Capital Reserve Amount of $1.2 billion, our dividend obligation to Treasury in March 2016 will be $1.7 billion. Under the Purchase Agreement, the payment of dividends does not reduce the outstanding liquidation preference of the senior preferred stock. As a result of the net worth sweep dividend on the senior preferred stock, our future profits will effectively be distributed to Treasury, and we cannot retain capital from the earnings generated by our business operations (other than a limited amount that will decrease to zero in 2018) or return capital to stockholders other than Treasury. See "Conservatorship and Related Matters" and "Regulation and Supervision" for more information.

The table below presents activity related to our equity capital during the last five quarters.

| (in millions) | Three Months Ended | | | | | | | | | | Year Ended | |
| | 12/31/2015 | | 9/30/2015 | | 6/30/2015 | | 3/31/2015 | | 12/31/2014 | | 12/31/2015 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning balance | $ | 1,299 | $ | 5,713 | $ | 2,546 | $ | 2,651 | $ | 5,186 | $ | 2,651 |
| Comprehensive income | | 1,641 | | (501) | | 3,913 | | 746 | | 251 | | 5,799 |
| Capital draw from Treasury | | — | | — | | — | | — | | — | | — |
| Senior preferred stock dividends declared | | — | | (3,913) | | (746) | | (851) | | (2,786) | | (5,510) |
| Total equity / net worth | $ | 2,940 | $ | 1,299 | $ | 5,713 | $ | 2,546 | $ | 2,651 | $ | 2,940 |
| Aggregate draws under Purchase Agreement | $ | 71,336 | $ | 71,336 | $ | 71,336 | $ | 71,336 | $ | 71,336 | $ | 71,336 |
| Aggregate cash dividends paid to Treasury | $ | 96,465 | $ | 96,465 | $ | 92,552 | $ | 91,806 | $ | 90,955 | $ | 96,465 |

# CONSERVATORSHIP AND RELATED MATTERS

## SUPERVISION OF OUR COMPANY DURING CONSERVATORSHIP

FHFA has broad powers when acting as our Conservator. Upon its appointment, the Conservator immediately succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any stockholder, officer or director of Freddie Mac with respect to Freddie Mac and its assets. The Conservator also succeeded to the title to all books, records and assets of Freddie Mac held by any other legal custodian or third party.

Under the GSE Act, the Conservator may take any actions it determines are necessary to put us in a safe and solvent condition and appropriate to carry on our business and preserve and conserve our assets and property. The Conservator's powers include the ability to transfer or sell any of our assets or liabilities, subject to certain limitations and post-transfer notice provisions, without any approval, assignment of rights or consent of any party. However, the GSE Act provides that loans and mortgage-related assets that have been transferred to a Freddie Mac securitization trust must be held by the Conservator for the beneficial owners of the trust and cannot be used to satisfy our general creditors.

We conduct our business subject to the direction of FHFA as our Conservator. The Conservator has delegated certain authority to the Board of Directors to oversee, and to management to conduct, business operations so we can operate in the ordinary course. The directors serve on behalf of, and exercise authority as directed by, the Conservator. The Conservator retains the authority to withdraw or revise its delegations of authority at any time. The Conservator also retains certain significant authorities for itself, and has not delegated them to the Board. The Conservator continues to provide strategic direction for the company and directs the efforts of the Board and management to implement its strategy. Despite the delegations of authority to management, many management decisions are subject to review and/or approval by FHFA and management frequently receives direction from FHFA on various matters involving day-to-day operations.

Our current business objectives reflect direction we received from the Conservator including the Conservatorship Scorecards. At the direction of the Conservator, we have made changes to certain business practices that are designed to provide support for the mortgage market in a manner that serves our public mission and other non-financial objectives. Given our public mission and the important role the Administration and our Conservator have placed on Freddie Mac in addressing housing and mortgage market conditions, we sometimes take actions that could have a negative impact on our business, operating results or financial condition, and thus contribute to a need for additional draws under the Purchase Agreement. Certain of these actions are intended to help homeowners and the mortgage market.

## TREASURY AGREEMENTS AND SENIOR PREFERRED STOCK

In connection with our entry into conservatorship, we entered into the Purchase Agreement with Treasury. Under the Purchase Agreement, we issued to Treasury both senior preferred stock and a warrant to purchase common stock. We refer to the Purchase Agreement and the warrant as the "Treasury Agreements." The Treasury Agreements and the senior preferred stock do not contain any provisions causing them to terminate or cease to exist upon the termination of conservatorship. The conservatorship, the Treasury Agreements and the senior preferred stock materially limit the rights of our common and

preferred stockholders (other than Treasury).

Pursuant to the Purchase Agreement, which we entered into through FHFA, in its capacity as Conservator, on September 7, 2008, we issued to Treasury one million shares of Variable Liquidation Preference Senior Preferred Stock with an initial liquidation preference of $1 billion and a warrant to purchase, for a nominal price, shares of our common stock equal to 79.9% of the total number of shares outstanding. The senior preferred stock and warrant were issued to Treasury as an initial commitment fee in consideration of Treasury's commitment to provide funding to us under the Purchase Agreement. We did not receive any cash proceeds from Treasury as a result of issuing the senior preferred stock or the warrant. However, deficits in our net worth have made it necessary for us to make substantial draws on Treasury's funding commitment under the Purchase Agreement. Under the Purchase Agreement, our ability to repay the liquidation preference of the senior preferred stock is limited and we will not be able to do so for the foreseeable future, if at all.

The Purchase Agreement provides that, on a quarterly basis, we generally may draw funds up to the amount, if any, by which our total liabilities exceed our total assets, as reflected on our GAAP consolidated balance sheet for the applicable fiscal quarter, provided that the aggregate amount funded under the Purchase Agreement may not exceed Treasury's commitment. As of December 31, 2015, the aggregate liquidation preference of the senior preferred stock was $72.3 billion, and the amount of available funding remaining under the Purchase Agreement was $140.5 billion. To the extent we draw additional funds in the future, the aggregate liquidation preference will increase and the amount of available funding remaining will decrease.

Treasury, as the holder of the senior preferred stock, is entitled to receive cumulative quarterly cash dividends, when, as and if declared by our Board of Directors. The dividends we have paid to Treasury on the senior preferred stock have been declared by, and paid at the direction of, the Conservator, acting as successor to the rights, titles, powers and privileges of the Board. Under the August 2012 amendment to the Purchase Agreement, our dividend obligation each quarter is the amount, if any, by which our Net Worth Amount at the end of the immediately preceding fiscal quarter, less the applicable Capital Reserve Amount, exceeds zero. As a result of the net worth sweep dividend, our future profits will effectively be distributed to Treasury, and the holders of our common stock and non-senior preferred stock will not receive benefits that could otherwise flow from any such future profits.

The senior preferred stock is senior to our common stock and all other outstanding series of our preferred stock, as well as any capital stock we issue in the future, as to both dividends and rights upon liquidation. We are not permitted to redeem the senior preferred stock prior to the termination of Treasury's funding commitment under the Purchase Agreement.

The Purchase Agreement and warrant contain covenants that significantly restrict our business and capital activities. For example, the Purchase Agreement provides that, until the senior preferred stock is repaid or redeemed in full, we may not, without the prior written consent of Treasury:

- Pay dividends on our equity securities, other than the senior preferred stock or warrant, or repurchase our equity securities;
- Issue any additional equity securities, except in limited instances;
- Sell, transfer, lease or otherwise dispose of any assets, other than dispositions for fair market value in the ordinary course of business, consistent with past practices, and in other limited circumstances; and

- Issue any subordinated debt.

# LIMITS ON OUR MORTGAGE-RELATED INVESTMENTS PORTFOLIO AND INDEBTEDNESS

Our ability to acquire and sell mortgage assets is significantly constrained by limitations under the Purchase Agreement and other limitations imposed by FHFA:

- Under the Purchase Agreement and FHFA regulation, the UPB of our mortgage-related investments portfolio is subject to a cap that decreases by 15% each year until the cap reaches $250 billion.

- Under the Purchase Agreement, we also may not incur indebtedness that would result in the par value of our aggregate indebtedness exceeding 120% of the amount of mortgage assets we are permitted to own on December 31 of the immediately preceding calendar year.

- Our Retained Portfolio Plan, which we adopted in 2014, provides for us to manage the mortgage-related investments portfolio so that it does not exceed 90% of the annual cap established by the Purchase Agreement, subject to certain exceptions. Under the plan, we may seek permission from FHFA to increase the plan's limit on the mortgage-related investments portfolio to 95% of the Purchase Agreement annual cap.

- FHFA indicated that any portfolio sales should be commercially reasonable transactions that consider impacts to the market, borrowers and neighborhood stability.

Our decisions with respect to managing the decline of the mortgage-related investments portfolio affect all three business segments. In order to achieve all of our portfolio reduction goals, it is possible that we may forgo economic opportunities in one business segment in order to pursue opportunities in another business segment. The reduction in the mortgage-related investments portfolio will result in a decline in income from this portfolio over time.

Our results against the limits imposed on our mortgage-related investments portfolio and aggregate indebtedness are shown below.

# REGULATION AND SUPERVISION

In addition to our oversight by FHFA as our Conservator, we are subject to regulation and oversight by FHFA under our charter and the GSE Act and to certain regulation by other government agencies. Furthermore, regulatory activities by other government agencies can affect us indirectly, even if we are not directly subject to such agencies' regulation or oversight. For example, regulations that modify requirements applicable to the purchase or servicing of mortgages can affect us.

## FEDERAL HOUSING FINANCE AGENCY

FHFA is an independent agency of the federal government responsible for oversight of the operations of Freddie Mac, Fannie Mae, and the FHLBs.

Under the GSE Act, FHFA has safety and soundness authority that is comparable to, and in some respects, broader than that of the federal banking agencies. FHFA is responsible for implementing the various provisions of the GSE Act that were added by the Reform Act.

### Receivership

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are less than our obligations for a period of 60 days. FHFA notified us that the measurement period for any mandatory receivership determination with respect to our assets and obligations would commence no earlier than the SEC public filing deadline for our quarterly or annual financial statements and would continue for 60 calendar days after that date. FHFA also advised us that, if, during that 60-day period, we receive funds from Treasury in an amount at least equal to the deficiency amount under the Purchase Agreement, the Director of FHFA will not make a mandatory receivership determination. In addition, we could be put into receivership at the discretion of the Director of FHFA at any time for other reasons set forth in the GSE Act.

Certain aspects of conservatorship and receivership operations of Freddie Mac, Fannie Mae and the FHLBs are addressed in an FHFA rule. Among other provisions, the rule indicates that FHFA generally will not permit payment of securities litigation claims during conservatorship and that claims by current or former shareholders arising as a result of their status as shareholders would receive the lowest priority of claim in receivership. In addition, the rule indicates that administrative expenses of the conservatorship will also be deemed to be administrative expenses of receivership and that capital distributions may not be made during conservatorship, except as specified in the rule.

### Capital Standards

FHFA suspended capital classification of us during conservatorship in light of the Purchase Agreement. The existing statutory and FHFA-directed regulatory capital requirements are not binding during the conservatorship. These capital standards are described in Note 16. Under the GSE Act, FHFA has the authority to increase our minimum capital levels temporarily or to establish additional capital and reserve requirements for particular purposes.

Pursuant to an FHFA rule, FHFA-regulated entities are required to conduct annual stress tests to determine whether such companies have sufficient capital to absorb losses as a result of adverse

# RISK FACTORS

The following section discusses material risks and uncertainties that could adversely affect our business, financial condition, results of operations, cash flows, strategies and/or prospects.

# CONSERVATORSHIP AND RELATED MATTERS

***Freddie Mac's future is uncertain.***

It is possible and perhaps likely that future legislative or regulatory action will materially affect our role, business model, structure, and results of operations. Some or all of our functions could be transferred to other institutions, and we could cease to exist as a stockholder-owned company, or at all. If any of these events occur, our shares could further diminish in value, or cease to have any value. Our stockholders may not receive any compensation for such loss in value.

Several bills were introduced in Congress in 2014 and 2015 concerning the future status of Freddie Mac, Fannie Mae, and the mortgage finance system, including bills which provided for the wind down of Freddie Mac and Fannie Mae or modification of the terms of the Purchase Agreement. The Administration has recommended reducing the role of Freddie Mac and Fannie Mae and ultimately winding down both companies.

The conservatorship is indefinite in duration. The timing, likelihood, and circumstances under which we might emerge from conservatorship are uncertain. Treasury would be required to consent to the termination of the conservatorship, other than in connection with receivership, and there can be no assurance it would do so. Even if the conservatorship is terminated, we would remain subject to the Purchase Agreement and the terms of the senior preferred stock. It is possible that the conservatorship could end with our being placed into receivership.

Because Treasury holds a warrant to acquire almost 80% of our common stock for nominal consideration, we could effectively remain under the control of the U.S. government even if the conservatorship is ended and the voting rights of common stockholders are restored. If Treasury exercises the warrant, the ownership interest in the company of our existing common stockholders will be substantially diluted.

In the past several years, a number of lawsuits were filed against the U.S. government, Freddie Mac and Fannie Mae challenging certain government actions related to the conservatorship and the Purchase Agreement. This may add to the uncertainty surrounding our future.

For more information, see "MD&A - Regulation and Supervision - *Legislative and Regulatory Developments*," "Legal Proceedings," and Note 15.

***We cannot retain capital from the earnings generated by our business operations (other than a limited amount that will decrease to zero in 2018), which increases the likelihood that we may request additional draws under the Purchase Agreement in future periods.***

We cannot retain capital from the earnings generated by our business operations, as a result of the net worth sweep dividend. This increases the likelihood that we will require draws in future periods, particularly as the required Capital Reserve Amount (which is $1.2 billion for 2016) declines over time. A variety of factors could influence whether we could require a draw, including the following:

- Deterioration of economic conditions, including increased levels of unemployment and declines in home prices or family incomes;
- Adverse changes in interest rates, yield curves, implied volatility or spreads, which could affect our financial assets and liabilities, including derivatives, and increase realized and unrealized losses recorded in earnings or AOCI;
- The required reductions in the size of our mortgage-related investments portfolio, reductions of higher yielding assets, or other limitations on our investment activities that reduce our earnings capacity;
- The success of any transactions or other steps we may take in an effort to mitigate the risk of needing additional draws from Treasury;
- Restrictions on our single-family guarantee activities that could reduce our income from these activities;
- Restrictions on the volume of multifamily business we may conduct or other limits on multifamily business activities that could reduce our income from these activities;
- Adverse changes in our liquidity or funding costs, or limitations on our access to public debt markets;
- A failure of one or more of our major counterparties to meet their obligations to us;
- Changes in accounting policies, practices, or guidance;
- The effects of our foreclosure prevention and loss mitigation efforts;
- Changes in housing or economic conditions, legislation, including reductions in corporate tax rates, or other factors that affect our assessment of our ability to realize our net deferred tax asset, and cause us to establish a valuation allowance against our net deferred tax asset; or
- Changes in business practices resulting from legislative and regulatory developments or direction from our Conservator.

Additional draws, which will increase the already substantial liquidation preference of our senior preferred stock and decrease the amount of Treasury's remaining commitment under the Purchase Agreement, may add to the uncertainty regarding our long-term financial sustainability.

***FHFA controls our business activities. The terms of the Purchase Agreement and the senior preferred stock significantly limit our business activities. We may be required to take actions that reduce our profitability, are difficult to implement, or expose us to additional risk.***

We are under the control of FHFA, as our Conservator, and are not managed to maximize stockholder returns. FHFA determines our strategic direction. We face a variety of different, and sometimes competing, business objectives and FHFA-mandated activities (e.g., the initiatives we are pursuing under the Conservatorship Scorecards). It may be difficult for us to devote sufficient resources and management attention to these multiple priorities. Some of the activities FHFA has required us to undertake are costly and difficult to implement, such as building the common securitization platform.

FHFA has required us to make changes to our business that have adversely affected our financial results. FHFA could require us to make additional changes at any time. For example, FHFA may require us to undertake activities that:

- Reduce our profitability;
- Expose us to additional credit, market, funding, operational, and other risks; or
- Provide additional support for the mortgage market to serve our public mission, but adversely affect our financial results.

From time to time, FHFA and Treasury have prevented us from engaging in business activities or transactions that we believe would be profitable, and they may do so again in the future. For example, FHFA could limit the amount of securities we could sell or further limit the size of our mortgage-related investments portfolio.

The Purchase Agreement and the terms of the senior preferred stock also place significant restrictions on our ability to manage our business, including limiting:

- The amount of indebtedness we may incur;
- The size of our mortgage-related investments portfolio; and
- Our ability to pay dividends, transfer certain assets, raise capital, and pay down the liquidation preference of the senior preferred stock.

The Purchase Agreement prohibits us from taking a variety of actions without Treasury's consent. Treasury has the right to withhold its consent for any reason. The warrant held by Treasury, the restrictions on our business under the Purchase Agreement, and the senior status and net worth dividend provisions of the senior preferred stock could adversely affect our ability to attract capital from the private sector in the future, should we be in a position to do so.

***If FHFA places us into receivership, our assets would be liquidated. The liquidation proceeds may not be sufficient to pay claims outstanding against Freddie Mac, repay the liquidation preference of our preferred stock, or make any distribution to our common stockholders.***

We can be put into receivership at the discretion of the Director of FHFA at any time for a number of reasons set forth in the GSE Act. In addition, FHFA could be required to place us into receivership if Treasury is unable to provide us with funding requested under the Purchase Agreement to address a deficit in our net worth. Treasury might not be able to provide the requested funding if, for example, the U.S. government were not fully operational because Congress had failed to approve funding or the government had reached its borrowing limit. For more information, see "MD&A - Regulation and Supervision - *Federal Housing Finance Agency - Receivership*."

Being placed into receivership would terminate the conservatorship. The purpose of receivership is to liquidate our assets and resolve claims against us. The appointment of FHFA as our receiver would terminate all rights and claims that our stockholders and creditors may have against our assets or under our Charter arising as a result of their status as stockholders or creditors, other than the potential ability to be paid upon our liquidation. Bills considered by Congress in 2014 and 2015 provided for Freddie Mac to eventually be placed into receivership.

If our assets were liquidated, the liquidation proceeds may not be sufficient to pay the secured and unsecured claims against us, repay the liquidation preference of any series of our preferred stock, or make any distribution to our common stockholders. If we are placed into receivership and do not or cannot fulfill our guarantee to the holders of our mortgage-related securities, such holders could become unsecured creditors with respect to claims made under our guarantee.

Proceeds would be available to repay the liquidation preference of other series of preferred stock only after paying the secured and unsecured claims of the company, the administrative expenses of the receiver and the liquidation preference of the senior preferred stock. Finally, only after the liquidation preference of all series of preferred stock is repaid would any proceeds be available for distribution to the holders of our common stock.

# MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

## MARKET INFORMATION

Our common stock, par value $0.00 per share, trades on the OTCQB Marketplace, operated by the OTC Markets Group Inc., under the ticker symbol "FMCC." As of February 4, 2016, there were 650,045,962 shares of our common stock outstanding.

The table below sets forth the high and low bid information for our common stock on the OTCQB Marketplace for the indicated periods and reflects inter-dealer prices, without retail mark-up, mark-down, or commission, and may not necessarily represent actual transactions.

|  | High | | Low |
|---|---|---|---|
| **2015 Quarter Ended** | | | |
| December 31 | $ | 2.67 | $ 1.57 |
| September 30 | | 2.61 | 1.90 |
| June 30 | | 2.84 | 2.18 |
| March 31 | | 3.32 | 2.04 |
| **2014 Quarter Ended** | | | |
| December 31 | $ | 2.50 | $ 1.44 |
| September 30 | | 4.58 | 2.56 |
| June 30 | | 4.78 | 3.63 |
| March 31 | | 6.00 | 2.63 |

## HOLDERS

As of February 4, 2016, we had 1,803 common stockholders of record.

## DIVIDENDS AND DIVIDEND RESTRICTIONS

We did not pay any cash dividends on our common stock during 2015 or 2014. Our payment of dividends is subject to the following restrictions:

- ***Restrictions Relating to the Conservatorship -*** The Conservator has prohibited us from paying any dividends on our common stock or on any series of our preferred stock (other than the senior preferred stock). FHFA has instructed our Board of Directors that it should consult with and obtain the approval of FHFA before taking actions involving dividends. In addition, FHFA has adopted a regulation prohibiting us from making capital distributions during conservatorship, except as authorized by the Director of FHFA.
- ***Restrictions Under the Purchase Agreement -*** The Purchase Agreement prohibits us and any of our subsidiaries from declaring or paying any dividends on Freddie Mac equity securities (other than

with respect to the senior preferred stock or warrant) without the prior written consent of Treasury.

- *Restrictions Under the GSE Act -* Under the GSE Act, FHFA has authority to prohibit capital distributions, including payment of dividends, if we fail to meet applicable capital requirements. However, our capital requirements have been suspended during conservatorship.
- *Restrictions Under our Charter -* Without regard to our capital classification, we must obtain prior written approval of FHFA to make any capital distribution that would decrease total capital to an amount less than the risk-based capital level or that would decrease core capital to an amount less than the minimum capital level. As noted above, our capital requirements have been suspended during conservatorship.
- *Restrictions Relating to Subordinated Debt -* During any period in which we defer payment of interest on qualifying subordinated debt, we may not declare or pay dividends on, or redeem, purchase or acquire, our common stock or preferred stock. Our qualifying subordinated debt provides for the deferral of the payment of interest for up to five years if either our core capital is below 125% of our critical capital requirement or our core capital is below our statutory minimum capital requirement, and the Secretary of the Treasury, acting on our request, exercises his or her discretionary authority pursuant to Section 306(c) of our Charter to purchase our debt obligations. FHFA has directed us to make interest and principal payments on our subordinated debt, even if we fail to maintain required capital levels. As a result, the terms of any of our subordinated debt that provide for us to defer payments of interest under certain circumstances, including our failure to maintain specified capital levels, are no longer applicable.
- *Restrictions Relating to Preferred Stock -* Payment of dividends on our common stock is also subject to the prior payment of dividends on our 24 series of preferred stock and one series of senior preferred stock, representing an aggregate of 464,170,000 shares and 1,000,000 shares, respectively, outstanding as of December 31, 2015. Payment of dividends on all outstanding preferred stock, other than the senior preferred stock, is subject to the prior payment of dividends on the senior preferred stock. We paid dividends on the senior preferred stock during 2015 at the direction of the Conservator, as discussed in "MD&A - LIQUIDITY AND CAPITAL RESOURCES" and Note 10. We did not declare or pay dividends on any other series of preferred stock outstanding in 2015.

# RECENT SALES OF UNREGISTERED SECURITIES

The securities we issue are "exempted securities" under the Securities Act of 1933. As a result, we do not file registration statements with the SEC with respect to offerings of our securities.

Following our entry into conservatorship, we suspended the operation of, and ceased making grants under, equity compensation plans. Previously, we had provided equity compensation under these plans to employees and members of our Board of Directors. Under the Purchase Agreement, we cannot issue any new options, rights to purchase, participations, or other equity interests without Treasury's prior approval. However, grants outstanding as of the date of the Purchase Agreement remain in effect in accordance with their terms. No stock options were exercised during the three months ended December 31, 2015. See Note 10 for more information.

# ISSUER PURCHASES OF EQUITY SECURITIES

We did not repurchase any of our common or preferred stock during 2015. Additionally, we do not currently have any outstanding authorizations to repurchase common or preferred stock. Under the

# NOTE 2: CONSERVATORSHIP AND RELATED MATTERS

## BUSINESS OBJECTIVES

We operate under the conservatorship that commenced on September 6, 2008, conducting our business under the direction of FHFA, as our Conservator. The conservatorship and related matters significantly affect our management, business activities, financial condition and results of operations. Upon its appointment, FHFA, as Conservator, immediately succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any stockholder, officer or director thereof, with respect to the company and its assets. The Conservator also succeeded to the title to all books, records, and assets of Freddie Mac held by any other legal custodian or third party. The Conservator has delegated certain authority to the Board of Directors to oversee, and management to conduct, business operations so that the company can continue to operate in the ordinary course. The directors serve on behalf of, and exercise authority as directed by, the Conservator.

We are also subject to certain constraints on our business activities under the Purchase Agreement. However, we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent.

Our current business objectives reflect direction we have received from the Conservator (including the Conservatorship Scorecards). At the direction of the Conservator, we have made changes to certain business practices that are designed to provide support for the mortgage market in a manner that serves our public mission and other non-financial objectives but may not contribute to our profitability. Certain of these objectives are intended to help homeowners and the mortgage market and may help to mitigate future credit losses. Some of these initiatives impact our near- and long-term financial results. Given our public mission and the important role the Administration and our Conservator have placed on Freddie Mac in addressing housing and mortgage market conditions, we may be required to take actions that could have a negative impact on our business, operating results or financial condition, and thus contribute to a need for additional draws under the Purchase Agreement.

In May 2014, FHFA issued its 2014 Strategic Plan, which updated FHFA's vision for implementing its obligations as Conservator of Freddie Mac and Fannie Mae and established three reformulated strategic goals. FHFA has also issued its Conservatorship Scorecards for 2014, 2015, and 2016. The Conservatorship Scorecards establish objectives and performance targets and measures for Freddie Mac and Fannie Mae (the "Enterprises") related to the strategic goals set forth in the Strategic Plan.

The 2014 Strategic Plan established three reformulated strategic goals for the conservatorships of Freddie Mac and Fannie Mae:

- **Maintain**, in a safe and sound manner, foreclosure prevention activities and credit availability for new and refinanced loans to foster liquid, efficient, competitive and resilient national housing finance markets.
- **Reduce** taxpayer risk through increasing the role of private capital in the mortgage market.
- **Build** a new single-family securitization infrastructure for use by the Enterprises and adaptable for use by other participants in the secondary market in the future.

As part of the first goal, the 2014 Strategic Plan describes various steps related to increasing access to mortgage credit for credit-worthy borrowers. The 2014 Strategic Plan provides for the Enterprises to continue to play an ongoing role in supporting multifamily housing needs, particularly for low-income households. The plan states that FHFA will continue to impose a production cap on Freddie Mac's and Fannie Mae's multifamily businesses. However, in 2015 FHFA allowed loans in certain affordable and underserved market segments to be excluded from the production cap. This allowance was maintained in the 2016 Conservatorship Scorecard with slight modification.

The second goal focuses on ways to transfer risk to private market participants and away from the Enterprises in a responsible way that does not reduce liquidity or adversely impact the availability of mortgage credit. The second goal provides for us to increase the use of single-family credit risk transfer transactions, continue using credit risk transfer transactions in the multifamily business and continue shrinking our mortgage-related investments portfolio consistent with the requirements in the Purchase Agreement, with a focus on selling less liquid assets.

The third goal includes the continued development of the Common Securitization Platform. FHFA refined the scope of this project to focus on making the new shared system operational for Freddie Mac's and Fannie Mae's existing single-family securitization activities. The third goal also provides for the Enterprises to work towards the development of a single (common) security.

We continue to align our resources and internal business plans to meet the goals and objectives provided to us by FHFA.

As a result of the net worth sweep dividend provisions of the senior preferred stock, we cannot retain capital from the earnings generated by our business operations (other than a limited amount that will decrease to zero in 2018) or return capital to stockholders other than Treasury, the holder of our senior preferred stock. Our future is uncertain, and the conservatorship has no specified termination date. We do not know what changes may occur to our business model during or following conservatorship, including whether we will continue to exist. We are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near term. Our future structure and role will be determined by the Administration and Congress, and it is possible and perhaps likely that there will be significant changes beyond the near term. We have no ability to predict the outcome of these deliberations.

## PURCHASE AGREEMENT AND WARRANT

### Overview

On September 7, 2008, we, through FHFA, in its capacity as Conservator, entered into the Purchase Agreement with Treasury. The Purchase Agreement was subsequently amended and restated on September 26, 2008, and further amended on May 6, 2009, December 24, 2009, and August 17, 2012. The amount of available funding remaining under the Purchase Agreement was $140.5 billion as of December 31, 2015. This amount will be reduced by any future draws.

The Purchase Agreement requires Treasury, upon the request of the Conservator, to provide funds to us after any quarter in which we have a negative net worth (that is, our total liabilities exceed our total assets, as reflected on our GAAP balance sheet). In addition, the Purchase Agreement requires Treasury, upon the request of the Conservator, to provide funds to us if the Conservator determines, at any time,

that it will be mandated by law to appoint a receiver for us unless we receive these funds from Treasury. In exchange for Treasury's funding commitment, we issued to Treasury, as an aggregate initial commitment fee one million shares of Variable Liquidation Preference Senior Preferred Stock (with an initial liquidation preference of $1 billion), which we refer to as the senior preferred stock, and a warrant to purchase, for a nominal price, shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis at the time the warrant is exercised, which we refer to as the warrant. We received no other consideration from Treasury for issuing the senior preferred stock or the warrant.

Treasury, as the holder of the senior preferred stock, is entitled to receive quarterly cash dividends, when, as and if declared by our Board of Directors. The dividends we have paid to Treasury on the senior preferred stock have been declared by, and paid at the direction of, the Conservator, acting as successor to the rights, titles, powers and privileges of the Board. Through December 31, 2012, the senior preferred stock accrued quarterly cumulative dividends at a rate of 10% per year. However, under the August 2012 amendment to the Purchase Agreement, the fixed dividend rate was replaced with a net worth sweep dividend beginning in the first quarter of 2013.

For each quarter from January 1, 2013 through and including December 31, 2017, the dividend payment will be the amount, if any, by which our Net Worth Amount at the end of the immediately preceding fiscal quarter, less the applicable Capital Reserve Amount, exceeds zero. The term Net Worth Amount is defined as the total assets of Freddie Mac (excluding Treasury's commitment and any unfunded amounts thereof), less our total liabilities (excluding any obligation in respect of capital stock), in each case as reflected on our consolidated balance sheets prepared in accordance with GAAP. If the calculation of the dividend payment for a quarter does not exceed zero, then no dividend will accrue or be payable for that quarter. The applicable Capital Reserve Amount was $1.8 billion for 2015, will be $1.2 billion for 2016, and will be reduced by $600 million each year thereafter until it reaches zero on January 1, 2018. For each quarter beginning January 1, 2018, the dividend payment will be the amount, if any, by which our Net Worth Amount at the end of the immediately preceding fiscal quarter exceeds zero. The amounts payable for dividends on the senior preferred stock could be substantial and will have an adverse impact on our financial position and net worth. The senior preferred stock is senior in liquidation preference to our common stock and all other series of preferred stock.

In addition to the issuance of the senior preferred stock and warrant, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury. Under the Purchase Agreement, the fee is to be determined in an amount mutually agreed to by us and Treasury with reference to the market value of Treasury's funding commitment as then in effect. However, pursuant to the August 2012 amendment to the Purchase Agreement, for each quarter commencing January 1, 2013, and for as long as the net worth sweep dividend provisions remain in form and content substantially the same, no periodic commitment fee under the Purchase Agreement will be set, accrue or be payable. Treasury had previously waived the fee for all prior quarters.

Under the Purchase Agreement, our ability to repay the liquidation preference of the senior preferred stock is limited and we will not be able to do so for the foreseeable future, if at all. The aggregate liquidation preference of the senior preferred stock will increase further if we receive additional draws under the Purchase Agreement or if any dividends or quarterly commitment fees payable under the Purchase Agreement are not paid in cash. We may need to make additional draws in future periods due to a variety of factors that could adversely affect our net worth.

The Purchase Agreement includes significant restrictions on our ability to manage our business, including limiting the amount of indebtedness we can incur and capping the size of our mortgage-related investments portfolio.

The Purchase Agreement has an indefinite term and can terminate only in limited circumstances, which do not include the end of the conservatorship. The Purchase Agreement therefore could continue after the conservatorship ends. However, Treasury's consent is required for a termination of conservatorship other than in connection with receivership. Treasury has the right to exercise the warrant, in whole or in part, at any time on or before September 7, 2028.

### Purchase Agreement Covenants

The Purchase Agreement provides that, until the senior preferred stock is repaid or redeemed in full, we may not, without the prior written consent of Treasury:

- Declare or pay any dividend (preferred or otherwise) or make any other distribution with respect to any Freddie Mac equity securities (other than with respect to the senior preferred stock or warrant);
- Redeem, purchase, retire or otherwise acquire any Freddie Mac equity securities (other than the senior preferred stock or warrant);
- Sell or issue any Freddie Mac equity securities (other than the senior preferred stock, the warrant and the common stock issuable upon exercise of the warrant and other than as required by the terms of any binding agreement in effect on the date of the Purchase Agreement);
- Terminate the conservatorship (other than in connection with a receivership);
- Sell, transfer, lease or otherwise dispose of any assets, other than dispositions for fair market value:

    - To a limited life regulated entity (in the context of a receivership);
    - Of assets and properties in the ordinary course of business, consistent with past practice;
    - Of assets and properties having fair market value individually or in aggregate less than $250 million in one transaction or a series of related transactions;
    - In connection with our liquidation by a receiver;
    - Of cash or cash equivalents for cash or cash equivalents; or
    - To the extent necessary to comply with the covenant described below relating to the reduction of our mortgage-related investments portfolio;

- Issue any subordinated debt;
- Enter into a corporate reorganization, recapitalization, merger, acquisition or similar event; or
- Engage in transactions with affiliates unless the transaction is: (a) pursuant to the Purchase Agreement, the senior preferred stock or the warrant; (b) upon arm's length terms; or (c) a transaction undertaken in the ordinary course or pursuant to a contractual obligation or customary employment arrangement in existence on the date of the Purchase Agreement.

The Purchase Agreement also requires us to reduce the amount of mortgage assets we own. The Purchase Agreement, as revised in the August 2012 amendment, provides that we could not own mortgage assets with UPB in excess of $650 billion on December 31, 2012, and on December 31 of each year thereafter may not own mortgage assets with UPB in excess of 85% of the aggregate amount of mortgage assets we are permitted to own as of December 31 of the immediately preceding calendar year, provided that we are not required to own less than $250 billion in mortgage assets. Under the Purchase

Agreement, we also may not incur indebtedness that would result in the par value of our aggregate indebtedness exceeding 120% of the amount of mortgage assets we are permitted to own on December 31 of the immediately preceding calendar year. The mortgage asset and indebtedness limitations are determined without giving effect to the changes to the accounting guidance for transfers of financial assets and consolidation of VIEs, under which we consolidated our single-family PC trusts and certain other VIEs in our financial statements as of January 1, 2010.

In addition, the Purchase Agreement provides that we may not enter into any new compensation arrangements or increase amounts or benefits payable under existing compensation arrangements of any named executive officer or other executive officer (as such terms are defined by SEC rules) without the consent of the Director of FHFA, in consultation with the Secretary of the Treasury.

The Purchase Agreement also provides that, on an annual basis, we are required to deliver a risk management plan to Treasury setting out our strategy for reducing our enterprise-wide risk profile and the actions we will take to reduce the financial and operational risk associated with each of our reportable business segments.

### Warrant Covenants

The warrant we issued to Treasury includes, among others, the following covenants:

- Our SEC filings under the Exchange Act will comply in all material respects as to form with the Exchange Act and the rules and regulations thereunder;
- Without the prior written consent of Treasury, we may not permit any of our significant subsidiaries to issue capital stock or equity securities, or securities convertible into or exchangeable for such securities, or any stock appreciation rights or other profit participation rights to any person other than Freddie Mac or its wholly-owned subsidiaries;
- We may not take any action that will result in an increase in the par value of our common stock;
- Unless waived or consented to in writing by Treasury, we may not take any action to avoid the observance or performance of the terms of the warrant and we must take all actions necessary or appropriate to protect Treasury's rights against impairment or dilution; and
- We must provide Treasury with prior notice of specified actions relating to our common stock, such as setting a record date for a dividend payment, granting subscription or purchase rights, authorizing a recapitalization, reclassification, merger or similar transaction, commencing a liquidation of the company or any other action that would trigger an adjustment in the exercise price or number or amount of shares subject to the warrant.

### Termination Provisions

The Purchase Agreement provides that the Treasury's funding commitment will terminate under any of the following circumstances:

- The completion of our liquidation and fulfillment of Treasury's obligations under its funding commitment at that time;
- The payment in full of, or reasonable provision for, all of our liabilities (whether or not contingent, including mortgage guarantee obligations); and
- The funding by Treasury of the maximum amount of the commitment under the Purchase Agreement.

In addition, Treasury may terminate its funding commitment and declare the Purchase Agreement null and void if a court vacates, modifies, amends, conditions, enjoins, stays or otherwise affects the appointment of the Conservator or otherwise curtails the Conservator's powers. Treasury may not terminate its funding commitment under the Purchase Agreement solely by reason of our being in conservatorship, receivership or other insolvency proceeding, or due to our financial condition or any adverse change in our financial condition.

### Waivers and Amendments

The Purchase Agreement provides that most provisions of the agreement may be waived or amended by mutual written agreement of the parties; however, no waiver or amendment of the agreement is permitted that would decrease Treasury's aggregate funding commitment or add conditions to Treasury's funding commitment if the waiver or amendment would adversely affect in any material respect the holders of our debt securities or mortgage guarantee obligations.

### Third-party Enforcement Rights

In the event of our default on payments with respect to our debt securities or mortgage guarantee obligations, if Treasury fails to perform its obligations under its funding commitment and if we and/or the Conservator are not diligently pursuing remedies in respect of that failure, the holders of these debt securities or mortgage guarantee obligations may file a claim in the United States Court of Federal Claims for relief requiring Treasury to fund to us the lesser of:

- The amount necessary to cure the payment defaults on our debt and mortgage guarantee obligations; and
- The lesser of:
  - The deficiency amount; and
  - The maximum amount of the commitment less the aggregate amount of funding previously provided under the commitment.

Any payment that Treasury makes under those circumstances will be treated for all purposes as a draw under the Purchase Agreement that will increase the liquidation preference of the senior preferred stock.

## IMPACT OF CONSERVATORSHIP AND RELATED DEVELOPMENTS ON THE MORTGAGE-RELATED INVESTMENTS PORTFOLIO

For purposes of the limit imposed by the Purchase Agreement and FHFA regulation, the UPB of our mortgage-related investments portfolio could not exceed $399.2 billion at December 31, 2015 and was $346.9 billion at that date. Our Retained Portfolio Plan, which we adopted in 2014, provides for us to manage the UPB of the mortgage-related investments portfolio so that it does not exceed 90% of the annual cap established by the Purchase Agreement (subject to certain exceptions). The annual 15% reduction in our mortgage-related investments portfolio cap until it reaches $250 billion is calculated based on the maximum allowable size of the mortgage-related investments portfolio, rather than the actual UPB of the mortgage-related investments portfolio, as of December 31 of the preceding year. Our ability to acquire and sell mortgage assets is significantly constrained by limitations of the Purchase Agreement and those imposed by FHFA.

## GOVERNMENT SUPPORT FOR OUR BUSINESS

We receive substantial support from Treasury and are dependent upon its continued support in order to continue operating our business. Our ability to access funds from Treasury under the Purchase Agreement, is critical to:

- Keeping us solvent;
- Allowing us to focus on our primary business objectives under conservatorship; and
- Avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions.

At September 30, 2015, our assets exceeded our liabilities under GAAP; therefore FHFA did not request a draw on our behalf and, as a result, we did not receive any funding from Treasury under the Purchase Agreement during the three months ended December 31, 2015. Since conservatorship began through December 31, 2015, we have paid cash dividends of $96.5 billion to Treasury at the direction of the Conservator.

Additionally, in recent years, the Federal Reserve purchased significant amounts of mortgage-related securities issued by us, Fannie Mae, and Ginnie Mae.

See Note 7 and Note 10 for more information on the conservatorship and the Purchase Agreement.

## HOUSING FINANCE AGENCY INITIATIVE

In 2009, we entered into a Memorandum of Understanding with Treasury, FHFA, and Fannie Mae, which sets forth the terms under which Treasury and, as directed by FHFA, we and Fannie Mae, would provide assistance to state and local HFAs so that the HFAs can continue to meet their mission of providing affordable financing for both single-family and multifamily housing. FHFA directed us and Fannie Mae to participate in the HFA initiative on a basis that is consistent with the goals of being commercially reasonable and safe and sound. Treasury's participation in these assistance initiatives does not affect the amount of funding that Treasury can provide to Freddie Mac under the Purchase Agreement.

The primary initiatives are as follows:

- *TCLFP* - In December 2009, on a 50-50 pro rata basis, Freddie Mac and Fannie Mae agreed to provide $8.2 billion of credit and liquidity support, including outstanding interest at the date of the guarantee, for variable rate demand obligations, or VRDOs, previously issued by HFAs. This support was provided through the issuance of guarantees, which provide credit enhancement to the holders of such VRDOs and also create an obligation to provide funds to purchase any VRDOs that are put by their holders and are not remarketed. Treasury provided a credit and liquidity backstop on the TCLFP. These guarantees replaced existing liquidity facilities from other providers. The guarantees were scheduled to expire on December 31, 2012. However, Treasury gave TCLFP participants the option to extend their individual TCLFP facilities to December 31, 2015 and certain participants elected to do so. No outstanding guarantees existed as of December 31, 2015.
- *NIBP* - In December 2009, on a 50-50 pro rata basis, Freddie Mac and Fannie Mae agreed to issue in total $15.3 billion of partially guaranteed pass-through securities backed by new single-family and certain new multifamily housing bonds issued by HFAs. Treasury purchased all of the pass-through securities issued by Freddie Mac and Fannie Mae. This initiative provided financing for HFAs to issue new housing bonds.

Treasury will bear the initial losses of principal up to 35% of total principal for these two initiatives combined, and thereafter Freddie Mac and Fannie Mae each will be responsible only for losses of principal on the securities that it issues to the extent that such losses are in excess of 35% of all losses under both initiatives. Treasury will bear all losses of unpaid interest. Under both initiatives, we and Fannie Mae were paid fees at the time bonds were securitized and are also paid ongoing fees for as long as the bonds remain outstanding.

## RELATED PARTIES AS A RESULT OF CONSERVATORSHIP

As a result of our issuance to Treasury of the warrant to purchase shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding, on a fully diluted basis, we are deemed a related party to the U.S. government. During the years ended December 31, 2015, 2014, and 2013, no transactions outside of normal business activities have occurred between us and the U.S. government (or any of its related parties), except for the following:

- The transactions discussed with Treasury above in "Purchase Agreement and Warrant," "Government Support for our Business" and "Housing Finance Agency Initiative";
- The transactions discussed in Note 4, Note 7, and Note 10; and
- The allocation or transfer of 4.2 basis points of each dollar of new business purchases to certain housing funds as required under the GSE Act.

In addition, we are deemed related parties with Fannie Mae as both we and Fannie Mae have the same relationships with FHFA and Treasury. All transactions between us and Fannie Mae have occurred in the normal course of business in conservatorship. In October 2013, FHFA announced the formation of CSS. CSS is equally-owned by Freddie Mac and Fannie Mae. In connection with the formation of CSS, we entered into a limited liability company agreement with Fannie Mae. In November 2014, we and Fannie Mae announced that a chief executive officer has been named for CSS. Additionally, we and Fannie Mae each appointed two executives to the CSS Board of Managers and signed governance and operating agreements for CSS. During the year ended December 31, 2015, we contributed $66 million of capital to CSS.

## SENIOR PREFERRED STOCK

Pursuant to the Purchase Agreement described in Note 2, we issued one million shares of senior preferred stock to Treasury on September 8, 2008, in partial consideration of Treasury's commitment to provide funds to us.

Shares of the senior preferred stock have a par value of $1, and have a stated value and initial liquidation preference equal to $1,000 per share. The liquidation preference of the senior preferred stock is subject to adjustment. Dividends that are not paid in cash for any dividend period will accrue and be added to the liquidation preference of the senior preferred stock. In addition, any amounts Treasury pays to us pursuant to its funding commitment under the Purchase Agreement and any quarterly commitment fees that are not paid in cash to Treasury nor waived by Treasury will be added to the liquidation preference of the senior preferred stock. As described below, we may make payments to reduce the liquidation preference of the senior preferred stock in limited circumstances. As discussed in Note 2, the quarterly commitment fee has been suspended.

Treasury, as the holder of the senior preferred stock, is entitled to receive quarterly cash dividends, when, as and if declared by our Board of Directors. The dividends we have paid to Treasury on the senior preferred stock have been declared by, and paid at the direction of, the Conservator, acting as successor to the rights, titles, powers and privileges of the Board. The dividend is presented in the period in which it is determinable for the senior preferred stock, as a reduction to net income (loss) available to common stockholders and net income (loss) per common share. The dividend is declared and paid in the following period and recorded as a reduction to equity in the period declared. Total dividends paid in cash during 2015, 2014, and 2013 at the direction of the Conservator were $5.5 billion, $19.6 billion, and $47.6 billion, respectively. See Note 2 for a discussion of our net worth sweep dividend.

The senior preferred stock is senior to our common stock and all other outstanding series of our preferred stock, as well as any capital stock we issue in the future, as to both dividends and rights upon liquidation. The senior preferred stock provides that we may not, at any time, declare or pay dividends on, make distributions with respect to, or redeem, purchase or acquire, or make a liquidation payment with respect to, any common stock or other securities ranking junior to the senior preferred stock unless:

- Full cumulative dividends on the outstanding senior preferred stock (including any unpaid dividends added to the liquidation preference) have been declared and paid in cash; and
- All amounts required to be paid with the net proceeds of any issuance of capital stock for cash (as described in the following paragraph) have been paid in cash.

Shares of the senior preferred stock are not convertible. Shares of the senior preferred stock have no general or special voting rights, other than those set forth in the certificate of designation for the senior preferred stock or otherwise required by law. The consent of holders of at least two-thirds of all outstanding shares of senior preferred stock is generally required to amend the terms of the senior preferred stock or to create any class or series of stock that ranks prior to or on parity with the senior preferred stock.

We are not permitted to redeem the senior preferred stock prior to the termination of Treasury's funding commitment set forth in the Purchase Agreement; however, we are permitted to pay down the liquidation preference of the outstanding shares of senior preferred stock to the extent of accrued and unpaid dividends previously added to the liquidation preference and not previously paid down and quarterly

commitment fees previously added to the liquidation preference and not previously paid down. In addition, if we issue any shares of capital stock for cash while the senior preferred stock is outstanding, the net proceeds of the issuance must be used to pay down the liquidation preference of the senior preferred stock; however, the liquidation preference of each share of senior preferred stock may not be paid down below $1,000 per share prior to the termination of Treasury's funding commitment. Following the termination of Treasury's funding commitment, we may pay down the liquidation preference of all outstanding shares of senior preferred stock at any time, in whole or in part. If, after termination of Treasury's funding commitment, we pay down the liquidation preference of each outstanding share of senior preferred stock in full, the shares will be deemed to have been redeemed as of the payment date.

The table below provides a summary of our senior preferred stock outstanding at December 31, 2015.

| (in millions, except initial liquidation preference price per share) | Shares Authorized | Shares Outstanding | Total Par Value | Initial Liquidation Preference Price Per Share | Total Liquidation Preference |
|---|---|---|---|---|---|
| Draw Date: | | | | | |
| September 8, 2008 | 1.00 | 1.00 | $ 1.00 | $ 1,000 | $ 1,000 |
| November 24, 2008 | — | — | — | N/A | 13,800 |
| March 31, 2009 | — | — | — | N/A | 30,800 |
| June 30, 2009 | — | — | — | N/A | 6,100 |
| June 30, 2010 | — | — | — | N/A | 10,600 |
| September 30, 2010 | — | — | — | N/A | 1,800 |
| December 30, 2010 | — | — | — | N/A | 100 |
| March 31, 2011 | — | — | — | N/A | 500 |
| September 30, 2011 | — | — | — | N/A | 1,479 |
| December 30, 2011 | — | — | — | N/A | 5,992 |
| March 30, 2012 | — | — | — | N/A | 146 |
| June 29, 2012 | — | — | — | N/A | 19 |
| Total, senior preferred stock | 1.00 | 1.00 | $ 1.00 | | $ 72,336 |

No cash was received from Treasury under the Purchase Agreement in 2015, because we had positive net worth at December 31, 2014, March 31, 2015, June 30, 2015, and September 30, 2015 and, consequently, FHFA did not request a draw on our behalf. At December 31, 2015, our assets exceeded our liabilities under GAAP; therefore no draw is being requested from Treasury under the Purchase Agreement. Our quarterly senior preferred stock dividend is the amount, if any, by which our Net Worth Amount at the end of the immediately preceding fiscal quarter exceeds the applicable Capital Reserve Amount, which was established at $3 billion for 2013 and declines to zero in 2018. Based on our Net Worth Amount at December 31, 2015 and the Capital Reserve Amount of $1.2 billion in 2016, our dividend obligation to Treasury in March 2016 will be $1.7 billion. See Note 2 for additional information. The aggregate liquidation preference on the senior preferred stock owned by Treasury was $72.3 billion as of both December 31, 2015 and 2014. See Note 16 for additional information.

## COMMON STOCK WARRANT

Pursuant to the Purchase Agreement described in Note 2, on September 7, 2008, we issued a warrant to purchase common stock to Treasury, in partial consideration of Treasury's commitment to provide funds to us.

The warrant may be exercised in whole or in part at any time on or before September 7, 2028, by delivery to us of a notice of exercise, payment of the exercise price of $0.00001 per share, and the warrant. If the market price of one share of our common stock is greater than the exercise price, then, instead of paying the exercise price, Treasury may elect to receive shares equal to the value of the warrant (or portion thereof being canceled) pursuant to the formula specified in the warrant. Upon exercise of the warrant, Treasury may assign the right to receive the shares of common stock issuable upon exercise to any other person.

We account for the warrant in permanent equity. At issuance on September 7, 2008, we recognized the warrant at fair value, and we do not recognize subsequent changes in fair value while the warrant remains classified in equity. We recorded an aggregate fair value of $2.3 billion for the warrant as a component of additional paid-in-capital. We derived the fair value of the warrant using a modified Black-Scholes model. If the warrant is exercised, the stated value of the common stock issued will be reclassified to common stock in our consolidated balance sheets. The warrant was determined to be in-substance non-voting common stock, because the warrant's exercise price of $0.00001 per share is considered non-substantive (compared to the market price of our common stock). As a result, the shares associated with the warrant are included in the computation of basic and diluted earnings (loss) per share. The weighted average shares of common stock outstanding for the years ended December 31, 2015, 2014, and 2013, respectively, included shares of common stock that would be issuable upon full exercise of the warrant issued to Treasury.

## PREFERRED STOCK

We have the option to redeem our preferred stock on specified dates, at their redemption price plus dividends accrued through the redemption date. However, without the consent of Treasury, we are restricted from making payments to purchase or redeem preferred stock as well as paying any preferred dividends, other than dividends on the senior preferred stock. All 24 classes of preferred stock are perpetual and non-cumulative, and carry no significant voting rights or rights to purchase additional Freddie Mac stock or securities. Costs incurred in connection with the issuance of preferred stock are charged to additional paid-in capital.

# Mitigating Actions Related to the Material Weakness in Internal Control Over Financial Reporting

As described above under "Management's Report on Internal Control Over Financial Reporting," we have one material weakness in internal control over financial reporting as of December 31, 2015 that we have not remediated.

Given the structural nature of this material weakness, we believe it is likely that we will not remediate it while we are under conservatorship. However, both we and FHFA have continued to engage in activities and employ procedures and practices intended to permit accumulation and communication to management of information needed to meet our disclosure obligations under the federal securities laws. These include the following:

- FHFA has established the Division of Conservatorship, which is intended to facilitate operation of the company with the oversight of the Conservator.
- We provide drafts of our SEC filings to FHFA personnel for their review and comment prior to filing. We also provide drafts of external press releases, statements and speeches to FHFA personnel for their review and comment prior to release.
- FHFA personnel, including senior officials, review our SEC filings prior to filing, including this Form 10-K, and engage in discussions with us regarding issues associated with the information contained in those filings. Prior to filing this Form 10-K, FHFA provided us with a written acknowledgment that it had reviewed the Form 10-K, was not aware of any material misstatements or omissions in the Form 10-K, and had no objection to our filing the Form 10-K.
- The Director of FHFA is in frequent communication with our Chief Executive Officer, typically meeting (in person or by phone) on at least a bi-weekly basis.
- FHFA representatives attend meetings frequently with various groups within the company to enhance the flow of information and to provide oversight on a variety of matters, including accounting, credit and capital markets management, external communications, and legal matters.
- Senior officials within FHFA's accounting group meet frequently with our senior financial executives regarding our accounting policies, practices, and procedures.

In view of our mitigating actions related to this material weakness, we believe that our consolidated financial statements for the year ended December 31, 2015 have been prepared in conformity with GAAP.

# Changes in Internal Control Over Financial Reporting During the Quarter Ended December 31, 2015

We evaluated the changes in our internal control over financial reporting that occurred during the quarter ended December 31, 2015 and concluded that the following matter has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

We continue to make considerable enhancements to our risk management framework. During 2015, we continued to enhance and refine our three-lines-of-defense risk management framework. As part of this effort, during 2015 we moved several key functions within the organization. As we continue to transition to our enhanced three-lines-of-defense framework, we may experience elevated operational risks, which we are managing. For more information, see "MD&A — Risk Management — Operational Risk — Operational Risk Management and Risk Profile."

# DIRECTORS, CORPORATE GOVERNANCE, AND EXECUTIVE OFFICERS

## DIRECTORS

### ELECTION OF DIRECTORS

As Conservator, FHFA determines the size of the company's Board and the scope of its authority. At the start of Conservatorship, FHFA determined that the Board is to have a Non-Executive Chairman, and is to consist of a minimum of 9 and not more than 13 directors, with the Chief Executive Officer being the only corporate officer serving as a member of the Board. The company currently has 13 Board members and expects to maintain the current Board size.

In addition, because FHFA as Conservator has succeeded to the rights of all shareholders of the company, the Conservator elects the directors. Accordingly, we will not solicit proxies, distribute a proxy statement to stockholders, or hold an annual meeting of stockholders in 2016. Instead, the Conservator has elected directors by written consent in lieu of an annual meeting. Annually, the Board identifies director nominees or candidates for the Conservator to consider for election by written consent. When there is a vacancy on the Board, the Board may exercise the authority delegated to it by the Conservator to fill such vacancy, subject to review by the Conservator.

On February 12, 2016, the Conservator executed a written consent, effective as of that date, re-electing each of the 13 then-current directors as a member of our Board. The individuals elected as directors by the Conservator are listed below.

| | |
|---|---|
| Raphael W. Bostic | Christopher S. Lynch |
| Carolyn H. Byrd | Sara Mathew |
| Launcelot F. Drummond | Saiyid T. Naqvi |
| Thomas M. Goldstein | Nicolas P. Retsinas |
| Richard C. Hartnack | Eugene B. Shanks, Jr. |
| Steven W. Kohlhagen | Anthony A. Williams |
| Donald H. Layton | |

See "Director Biographical Information" for information about each of our re-elected directors. The terms of those directors will end on the date of the next annual meeting of our stockholders or when the Conservator next elects directors by written consent, whichever occurs first.