

Federal Housing Finance Agency
Office of Inspector General

# FHFA's Oversight of the Servicing Alignment Initiative

Evaluation Report • EVL–2014–003 • February 12, 2014



# Synopsis

February 12, 2014

# FHFA's Oversight of the Servicing Alignment Initiative

## Why OIG Did This Report

During the financial crisis which started in 2007, delinquencies on mortgage loans owned or guaranteed by Fannie Mae and Freddie Mac (the Enterprises) increased rapidly. Many mortgage servicers – private companies contracted by the Enterprises to service their mortgages – did not respond effectively to the surge in delinquencies. For example, servicers often failed to assist financially distressed borrowers to secure Enterprise-sponsored loan modifications that would create more affordable mortgage payments. Consequently, many such borrowers ultimately lost their homes through foreclosure. Moreover, the Enterprises themselves likely incurred additional losses due to their servicers' failure to execute consistently their contractual responsibilities with respect to delinquent borrowers.

As the Enterprises' conservator, the Federal Housing Finance Agency (FHFA or Agency) established the Servicing Alignment Initiative (SAI) in April 2011 to improve the servicers' performance and thereby limit the Enterprises' financial losses.

SAI consists of a series of FHFA directives that set forth contractual requirements that the Enterprises must incorporate into their servicing guidelines. Servicers must comply with these guidelines when managing the accounts of financially distressed borrowers. For example, servicers are required to respond to borrowers' requests for assistance within specified timeframes, and conduct loan modifications and foreclosures pursuant to procedures and deadlines prescribed by FHFA.

We commenced this evaluation to assess FHFA's oversight of SAI since the establishment of the program in 2011. Specifically, we assessed FHFA's monitoring of the Enterprises' servicers' compliance with SAI guidelines.

## What OIG Found

*FHFA's Monitoring of Enterprise Servicers' Compliance with SAI is Limited*

FHFA's Division of Housing Mission and Goals (DHMG), which established SAI, has primary responsibility within the Agency for overseeing SAI and servicer compliance with its requirements. Therefore, DHMG staff reviewed the Enterprises' servicing guidelines prior to their publication in 2011 to ensure that they incorporated FHFA's SAI-related directives. DHMG also periodically communicates with other FHFA divisions and units with respect to the implementation of the SAI program.

However, DHMG's SAI oversight has significant limitations. Specifically, since establishing the program in 2011, DHMG has neither reviewed nor evaluated the servicers' overall compliance with SAI's numerous requirements. Moreover, DHMG does not require the Enterprises to submit for its routine review and assessment their critical reports on servicer compliance with SAI's requirements. Consequently, DHMG has not determined whether the servicers are complying with SAI or if the initiative is achieving its intended purpose.



**Synopsis**

February 12, 2014

We analyzed the reports by which the Enterprises monitor their servicers' compliance with SAI. The reports identified servicer compliance deficiencies in key SAI areas such as responding to borrower requests for assistance and executing loan modifications. DHMG has not received these reports on a regular basis. Consequently, DHMG has missed opportunities to learn about servicer compliance deficiencies that could undermine SAI's effectiveness. It has also compromised FHFA's ability to oversee the Enterprises' efforts to correct their servicers' SAI compliance deficiencies.

## What OIG Recommends

We recommend that DHMG's Deputy Director:

1. Establish an ongoing process to evaluate servicers' SAI compliance and the effectiveness of the Enterprises' remediation efforts;

2. Direct the Enterprises to provide routinely their internal reports and reviews for DHMG's assessment; and

3. Regularly review SAI-related guidelines for enhancements or revisions, as necessary, based on servicers' actual versus expected performance.

# TABLE OF CONTENTS ..............................................................

ABBREVIATIONS ........................................................................5

PREFACE ....................................................................................6

CONTEXT ...................................................................................8

    Servicers Are Required to Manage Enterprise Mortgages in Compliance with the
Enterprises' Servicing Guidelines .........................................................8

    Many of the Enterprises' Servicers Failed to Properly Manage Delinquent Borrower
Accounts During the Financial Crisis....................................................9

    FHFA Established SAI to Address Enterprise Servicer Deficiencies in the
Management of Delinquent Mortgages ...............................................10

        FHFA's Initial SAI Directive .......................................................11

        FHFA's Subsequent SAI Directives ..............................................12

        FHFA's Servicer Performance Goals .............................................12

        FHFA's Examination of the Enterprises' Implementation of SAI ................13

FINDINGS..................................................................................14

    1.    DHMG's SAI and Servicer Oversight Program is Limited ...........................14

    2.    Enterprise Reports Indicate Considerable Servicer Non-Compliance with SAI's
Requirements ............................................................................15

CONCLUSION.............................................................................17

RECOMMENDATIONS ..................................................................17

OBJECTIVE, SCOPE, AND METHODOLOGY .......................................18

APPENDIX A ..............................................................................19

    FHFA's Comments on OIG's Findings and Recommendations ...........................19

APPENDIX B ..............................................................................23

    OIG's Response to FHFA's Comments ................................................23

ADDITIONAL INFORMATION AND COPIES .......................................25

# ABBREVIATIONS ...........................................................

| | |
|---|---|
| BRP | Borrower Response Package |
| DER | FHFA Division of Enterprise Regulation |
| DHMG | FHFA Division of Housing Mission and Goals |
| Enterprises | Fannie Mae and Freddie Mac |
| Fannie Mae | Federal National Mortgage Association |
| FHFA or Agency | Federal Housing Finance Agency |
| Freddie Mac | Federal Home Loan Mortgage Corporation |
| GPRMA | Government Performance and Results Modernization Act of 2010 |
| OIG | Federal Housing Finance Agency Office of Inspector General |
| QRPC | Quality Right Party Contact |
| SAI | Servicing Alignment Initiative |

# PREFACE ...........................................................

The Enterprises support the secondary market by purchasing mortgages that meet their underwriting standards from originators such as banks or thrifts. Traditionally, the Enterprises hold these mortgages in their retained portfolios or package them into mortgage-backed securities that they sell to investors.

The Enterprises' servicers perform a variety of contractual functions on behalf of the Enterprises, including the management of accounts of borrowers who become delinquent on their mortgage obligations. In this regard, servicers are expected to assist such borrowers in obtaining foreclosure alternatives,[1] such as loan modifications[2] or short sales.[3] If a borrower cannot repay the mortgage and a foreclosure alternative cannot be completed, then the servicer is required to liquidate the mortgage through foreclosure.

Beginning in 2007, the U.S. financial crisis caused mortgage delinquencies to increase significantly in a relatively short period of time. However, many servicers did not respond in a timely way to financially distressed borrowers who requested assistance. In some cases, they failed to process loan modifications and foreclosures effectively. They also engaged in abusive practices that harmed borrowers; and the servicers' poor performance likely caused the Enterprises to incur financial losses.

In 2011, FHFA established SAI to improve mortgage servicing and limit Enterprise financial losses. It consisted of a series of contractual provisions that the Enterprises were required to incorporate into their servicing guidelines. For their part, servicers must comply with these guidelines in managing the accounts of financially distressed borrowers. For example, servicers are required to respond to borrowers' requests for assistance within specified timeframes, and conduct loan modifications and foreclosures pursuant to procedures and deadlines prescribed by FHFA. SAI also established a system of financial rewards and penalties to encourage servicer compliance with its terms.

Given SAI's importance to the matter of servicer performance, we initiated this evaluation to assess FHFA's oversight of it. Specifically, we assessed FHFA's monitoring of the Enterprises' servicers' compliance with SAI's requirements.

---

[1] Foreclosure alternatives include a payment plan, forbearance plan, loan modification, short sale, or deed-in-lieu of foreclosure.

[2] In a loan modification, the terms of a mortgage are modified to create a more affordable monthly payment for the borrower. Upon completion of the modification, the mortgage is brought to a current status.

[3] In a short sale, the borrower is permitted to avoid a completed foreclosure by selling the property for less than the payoff balance of the mortgage.

This evaluation was led by Christine Eldarrat, Senior Policy Advisor, with assistance from Brian Harris, Investigative Counsel; Desiree I-Ping Yang, Financial Analyst; and Irene Porter, Supervisory Auditor.  We appreciate the cooperation of everyone who contributed to this evaluation.  It has been distributed to Congress, the Office of Management and Budget, and others and will be posted on OIG's website, www.fhfaoig.gov.

Richard Parker
Deputy Inspector General for Evaluations

# CONTEXT ................................................................

## Servicers Are Required to Manage Enterprise Mortgages in Compliance with the Enterprises' Servicing Guidelines

The Enterprises contract with servicers to manage the mortgages they own or guarantee. Upon origination a mortgage is transferred to a servicer. The servicer is often an affiliate of the lender that originated the mortgage.[4] Figure 1 contains a list of the largest mortgage servicers.

Each Enterprise's servicing guidelines contains a list of duties that its servicers must carry out in order to fulfill their contractual obligations to the Enterprise. Figure 2, below, depicts the servicers' contractual relationship with the Enterprises.[6]

When a mortgage is performing, i.e., the borrower is making timely payments, then the servicing guidelines specify that the job of the servicer is to collect principal and interest payments from the borrower and remit them to the Enterprise. As compensation, the servicer retains a small percentage of the payment received from the borrower as a servicing fee.

The Enterprises' servicing guidelines also contain extensive instructions on the management of non-performing mortgages, i.e., those that are delinquent. These instructions cover activities such as contacting the borrower, managing bankruptcy cases, implementing foreclosure alternatives, and pursuing foreclosures.

| FIGURE 1. TOP TEN ENTERPRISE MORTGAGE SERVICERS |
| --- |
| Top Ten Enterprise Servicers as of October 2013 (alphabetical order)[5] |
| 1. Bank of America |
| 2. CitiMortgage |
| 3. Green Tree |
| 4. JP Morgan Chase |
| 5. Nationstar |
| 6. Ocwen |
| 7. PHH Mortgage |
| 8. PNC Bank |
| 9. US Bank |
| 10. Wells Fargo |

---

[4] However, not all servicers are affiliated with a lender. Some servicers purchase the mortgage servicing rights from lenders or other servicers and then service the underlying loans on behalf of the Enterprises.

[5] Source: Internal Enterprise reports based on the number of mortgages serviced.

[6] Fannie Mae's servicing guidelines (Fannie Mae Servicing Guide) can be found at https://www.fanniemae.com/singlefamily/servicing; Freddie Mac's servicing guidelines (Freddie Mac Single-Family Seller/Servicer Guide) can be found at http://www.freddiemac.com/singlefamily/service/.

**FIGURE 2.** MORTGAGE SERVICING

**Performing (Current) Loan**

– Homeowner submits mortgage payment to Servicer

– Servicer retains a portion of the mortgage payment as compensation
– Servicer forwards the principal and interest payment to the Enterprise

**Borrower**        **Servicer**        **Enterprise**





– Servicer communicates with delinquent borrowers as specified in the Enterprise's servicing guidelines
– This includes offering foreclosure alternatives and, if necessary, beginning the foreclosure process

– Enterprise issues servicing guidelines, including a section that instructs Servicer on how to service delinquent loans

**Non-Performing (Delinquent) Loan**

## Many of the Enterprises' Servicers Failed to Properly Manage Delinquent Borrower Accounts During the Financial Crisis

During the financial crisis, which started in 2007, there was a surge in the number of borrowers who became delinquent on mortgages owned or guaranteed by the Enterprises. In particular, the Enterprises' serious delinquency rates increased from a low of 0.92% (277,000 mortgages) in January 2008, to a peak of 4.93% (1,501,000 mortgages) in March 2010.[7]

In many cases, servicers failed to properly manage the surge in delinquencies. Specifically, servicers:

- Often did not timely respond to financially distressed borrowers' requests for assistance;

---

[7] Source: FHFA's Foreclosure Prevention Reports. The serious delinquency rate measures the percent of mortgages in the Enterprises' portfolios that are three or more payments late, including those mortgages that are in foreclosure and subject to disposition pursuant to bankruptcy proceedings.

- Failed to properly administer loan modifications such as Treasury's Home Affordable Modification Program (HAMP);[8]

- Engaged in "dual-tracking," which is the simultaneous pursuit of both a foreclosure alternative, such as a loan modification, and foreclosure for the same borrower;

- Lost critical borrower documents such as applications for foreclosure alternatives; and

- Did not meet the various legal requirements within the foreclosure process, which gave rise to abusive practices such as "robo-signing."[9]

This poor servicer performance had an adverse financial impact on the Enterprises. According to FHFA and the Enterprises, foreclosing upon a mortgage generally results in a greater credit loss than does sustaining a mortgage through a foreclosure alternative.[10] Thus, the servicers' failure to properly manage delinquent mortgages likely resulted in foreclosures in cases in which foreclosure alternatives would have served better the interest of the Enterprises and, by extension, the taxpayer. Conversely, in situations in which borrowers are unable to meet their obligations despite consideration of foreclosure alternatives, it is generally in the Enterprises' best financial interests for servicers to pursue foreclosure actions on a timely basis. Thus, the servicers' failure to pursue foreclosures pursuant to established timelines likely increased the Enterprises' related losses.[11]

## FHFA Established SAI to Address Enterprise Servicer Deficiencies in the Management of Delinquent Mortgages

In April 2011, FHFA established SAI to improve the servicers' management of delinquent mortgages and limit the Enterprises' associated losses. SAI contains uniform servicing requirements, compliance with which may be encouraged by monetary incentives and

---

[8] HAMP is Treasury's modification program under the Making Home Affordable Initiative that was announced by President Obama in February 2009. Both Enterprises offer HAMP and non-HAMP modifications. In all delinquency cases, the Enterprises must evaluate the borrower for a HAMP modification first.

[9] "Robo-signing" refers to a variety of practices, including: signing documents without verifying the information in them; forging an authorized signature on a document, e.g., the signature of a bank executive; misrepresenting the title of an authorized signer; and failing to comply with notary procedures as required by the relevant jurisdiction.

[10] When foreclosure occurs, the Enterprise seizes control of the property securing the mortgage and resells it to recover some of its credit and other related losses. While in the Enterprise's inventory, the foreclosed property may further increase the Enterprise's credit losses by, for example, further declining in value, and incurring maintenance, tax, and other expenses.

[11] When foreclosure becomes unavoidable, it is generally in the Enterprise's financial interest for it to be conducted as quickly as permitted by state laws and regulations. For example, a property that is not maintained properly during a lengthy foreclosure process may suffer a decline in value and bring a lower resale price.

penalties.[12]  DHMG[13] is primarily responsible for the oversight of SAI and the Enterprises' efforts to ensure that their servicers comply with its provisions.

### FHFA's Initial SAI Directive

In 2011 FHFA directed the Enterprises to update their servicing guidelines by adding new standards and timelines by which servicers were to manage delinquent mortgages.  The changes affected the following key areas, known as SAI work streams:

- **Borrower Contact and Delinquency Management** – Changes in this area aligned servicer requirements for: (1) contacting borrowers – including rules regarding collection calls, written communications, and quality right party contacts (QRPC);[14] (2) responding to borrower response packages (BRP);[15] (3) referring mortgages to foreclosure; and (4) reviewing and responding to borrower inquiries and complaints. In addition, they established incentives and penalties related to the receipt of completed BRPs.

- **Property Inspections** – Changes in this area aligned servicer requirements for ordering property inspections.  Servicers are required to identify and pay particular attention to vacant, tenant-occupied, and abandoned properties.

- **Foreclosure Timelines** – Changes in this area aligned state-level timelines for the processing of foreclosures from the date of referral to the attorney/trustee through the date of the foreclosure sale.  They also established compensatory fees for servicer non-compliance.

- **Standard Loan Modifications** – Changes in this area aligned requirements for a standard loan modification (a non-HAMP modification), including eligibility and documentation criteria, along with approval terms and conditions.  The changes established incentives for servicers to complete standard modifications.

---

[12] Additional remedies are available to the Enterprises when a servicer fails to meet its contractual obligations, including requiring the servicer to indemnify the Enterprise for losses or imposing a suspension.  Whether and when the Enterprises impose penalties or pursue remedies is outside the scope of this evaluation.

[13] DHMG is responsible for policy development and analysis, oversight of housing and regulatory policy, oversight of the mission and goals of the Enterprises, and the housing finance and community and economic development mission of the Federal Home Loan Banks.

[14] A QRPC occurs when a servicer identifies and discusses with a borrower, co-borrower, or trusted party, such as a housing counselor, the most appropriate options for resolving the delinquency.  During a QRPC the servicer:  establishes rapport with the borrower; determines the reason for delinquency, the occupancy status of, or intent to vacate, the mortgaged property; educates the borrower on alternatives to foreclosure; and obtains the borrower's commitment on the next steps.

[15] When a borrower seeks to avoid foreclosure and requests assistance, the servicer will require the borrower to submit a BRP.  Generally, a BRP includes a completed and signed *Uniform Borrower Assistance Form* (Fannie Mae/Freddie Mac Form 710) and documentation of the hardship, employment, and income.

The Enterprises revised their servicing guidelines to reflect these changes.

### FHFA's Subsequent SAI Directives

Beginning in January 2012, FHFA released four additional SAI directives over a period of 14 months. Each directive was focused on a specific SAI work stream, and the Enterprises modified their servicing guidelines accordingly.

- **Unemployment Forbearance** – This program allows a borrower to pay less than the payment required by the mortgage note for a defined period of time not to exceed six months. Upon completion of the plan, the borrower is required to bring the account current.

- **Short Sales** – This program allows a borrower to sell the property for less than the payoff balance of the mortgage to avoid a completed foreclosure.[16]

- **Deed-in-Lieu** – This program allows a borrower to convey the property to the mortgage holder to satisfy the mortgage and avoid foreclosure.

- **Streamlined Modification** – This program modifies the terms of the mortgage to create a more affordable payment for the borrower.

### FHFA's Servicer Performance Goals

FHFA's directives also established specific servicer performance goals to ensure improvements within the various SAI work streams.[17] For example, FHFA's initial directive contained at least 35 mandatory servicer activities and established a variety of performance goals by which the Enterprises could measure servicers' progress in achieving them. Figure 3 provides examples of some of those activities and goals.

---

[16] The payoff balance is the sum of the following: unpaid principal, accrued but unpaid interest, balance of tax and insurance escrows, and default-related expenses, e.g., attorney fees and costs, title costs, and property inspection fees.

[17] FHFA's establishment of such performance goals appears consistent with the Government Performance and Results Modernization Act of 2010 (GPRMA). GPRMA establishes the importance of setting performance goals that are objective, quantifiable, and measurable for significant federal agency activities. Furthermore, it establishes the importance of setting performance indicators to measure progress toward those goals and to assess actual results against expected performance. Finally, GPRMA identifies program evaluation as a means for assessing, through objective measurement and systematic analysis, the manner and extent to which federal programs achieve their intended objectives.

| **FIGURE 3**. EXAMPLES OF SERVICER PERFORMANCE GOALS | |
|---|---|
| **Activity** | **Servicer Performance Goals** |
| **Call Center Benchmarks** | − Servicer should ensure that no more than 5% of incoming borrower calls are abandoned.[18]<br>− Servicer should answer borrower calls within 60 seconds.<br>− Servicer should answer borrower emails within 48 hours. |
| **QRPC** | − Servicer should establish a QRPC on at least 60% of the loans in the 120-day delinquent portfolio. |
| **BRP** | − Within 30 days of receipt of a BRP, servicer should send the Evaluation Notice of foreclosure alternative options to the borrower. |
| **Foreclosure Referral Timeframe** | − No later than 120 days from the due date of the last paid installment, servicer should refer the delinquent account to an attorney to initiate foreclosure proceedings. |

***FHFA's Examination of the Enterprises' Implementation of SAI***

In mid-2013, FHFA's Division of Enterprise Regulation (DER) completed targeted examinations of the Enterprises' implementation of SAI.[19] DER examiners reviewed the various controls that the Enterprises established to ensure that their servicers comply with SAI's requirements. DER found that, as a general matter, the Enterprises' controls were adequate.

Although DER examined the Enterprises' controls over their servicers, its examiners did not assess the servicers' compliance with SAI's various requirements. As discussed in the Findings below, assessing the servicers' compliance with SAI is DHMG's responsibility.

---

[18] An abandoned call is one that is made to a call center but ends before a conversation occurs, i.e., the caller hangs up before contact is made. When an inbound call is abandoned, it is often because the caller is frustrated with the amount of time spent on hold or his/her inability to speak with a human being.

[19] DER is responsible for ensuring the safety and soundness of Enterprise operations and compliance with laws and regulations. It conducts examinations and other activities based on its annual assessments of the highest risks facing the Enterprises as well as their management of such risks.

# FINDINGS.........................................................................................................

### 1. DHMG's SAI and Servicer Oversight Program is Limited

According to DHMG's Deputy Director, the division is primarily responsible for overseeing SAI and servicer's compliance with the program's requirements and performance goals. Therefore, in 2011 DHMG reviewed the SAI-related changes to their servicing guidelines made by the Enterprises. DHMG has also communicated with other FHFA divisions regarding SAI's implementation.

However, DHMG's SAI and servicer compliance oversight program has significant limitations. In particular, DHMG has neither reviewed nor evaluated the servicers' overall compliance with numerous SAI-related guidelines and performance goals even though they have been in place since 2011.[20] As a result, DHMG is not in a position to determine whether SAI is achieving the intended objectives: improving the servicers' management of delinquent accounts and limiting the Enterprises' losses. Neither is DHMG in a position to assess the overall effectiveness of the Enterprises' initiatives to ensure that servicers correct identified SAI compliance deficiencies.

Moreover, DHMG does not require the Enterprises to submit critical internal reports and reviews on servicers' SAI compliance that would be of benefit to the division's oversight program.[21] Although DHMG periodically reviews some Enterprise reports on servicer performance, these reports are of limited utility. For example, some provide aggregated Enterprise financial information, but do not provide a sufficient understanding of servicers' SAI compliance and progress in achieving their numerous performance goals.

---

[20] In August 2012, the Enterprises briefed DHMG on SAI's first year of operations. Based upon this presentation, DHMG concluded that SAI was a success because "all major delinquency categories were reduced with the implementation of SAI." However, DHMG's conclusion was not well-founded.

We reviewed the PowerPoint presentation provided to DHMG by the Enterprises in August 2012. It does not contain evidence establishing a causal relationship between SAI and the decrease in defaults. We also reviewed the Enterprise reports set forth in note 23, *infra*. They do not provide a basis from which to conclude that SAI caused the decline in defaults, nor do they indicate that there has been consistent servicer compliance with SAI.

[21] We believe that FHFA's failure to review and assess the information in these reports is inconsistent with its responsibility under GPRMA to evaluate whether, and how well, SAI is meeting its intended objectives. *See* footnote 17, *supra*.

## 2. Enterprise Reports Indicate Considerable Servicer Non-Compliance with SAI's Requirements

We reviewed reports that the Enterprises use to monitor[22] servicer compliance with SAI-related guidelines,[23] most of which are not provided routinely to DHMG. We identified the following potentially significant SAI compliance deficiencies:[24,25]

- In October 2013, an Enterprise reported on the servicer quality reviews conducted that month for 18 of its servicers. Based upon these reviews, the Enterprise made 63 SAI non-compliance findings in multiple areas, including: untimely referrals to foreclosure and completed foreclosures; failure to solicit borrowers to consider foreclosure alternatives, and failure to respond timely to requests for foreclosure alternatives; and failure to complete loan modifications timely and document modifications sufficiently.

- In August 2012, an Enterprise's servicer performance scorecard[26] rated 34 of the top 35 servicers on components measured by the SAI servicer quality review. Twenty-five servicers received a rating of "satisfactory," while nine servicers received a rating of "needs significant improvement." In October 2013, 19 of the top 30 servicers were rated. Ten servicers received a rating of "satisfactory," four servicers received a rating of "needs improvement," and five servicers received a rating of "needs significant improvement" on their overall servicer quality review rating.

---

[22] The Enterprises conduct SAI-related servicer quality reviews of individual servicers. They include sampling loan-level data and documents from servicers. The results of a review allow the Enterprises to make a finding when there is evidence that the servicer failed to comply with one of the SAI guidelines. However, as detailed in our Findings, the Agency does not actively monitor the Enterprises' oversight of their servicers' compliance with SAI.

[23] We obtained the following reports from the Enterprises for our review:

Fannie Mae: Borrower Response Package Report; Compensatory Fee Reports; Lender Assessment of Risk and Controls Report; NSO Monthly Fact Book; NSO Performance Scorecard; Property Inspection Exception Report; SAI Call Center Metrics Report; Servicer Quality and Risk Review Report; SQR Remediation Reports; SQR Servicing Alignment Initiative Findings; and the STAR Program Performance Scorecard Report.

Freddie Mac: Borrower Response Package Monthly Progress Report; Operational Review; Program Compliance Review; Prudent Servicing Review; Servicer Performance Grid – Larger and Specialty Servicers Report; Servicing Account Plan Report; Servicing Quality Assurance Monthly Management Report; Single Family Servicing and REO – Monthly Performance Report and Financial Drivers Analysis; SPP Executive Summary Report; and the SPP Servicer Success Program Scorecard.

[24] We note, as discussed earlier, that the DER exams indicated the Enterprises were producing reports that allowed them to monitor servicers' performance and SAI compliance.

[25] Our observations of continued deficiencies in mortgage servicing are consistent with the Consumer Financial Protection Board's observations as identified in its September 2013 *Supervisory Highlights* report.

[26] The servicer performance scorecard is a high-level report that graphically represents servicers' progress toward achieving Enterprise targets or goals over time. A scorecard allows for performance monitoring and identification of less than acceptable performance.

DHMG's Deputy Director, who was appointed in March 2013, acknowledged in discussions with us that the division's past SAI oversight efforts have been limited. She emphasized that servicers' compliance with SAI and other Agency directives is of critical importance, and that she receives the Enterprises' monthly servicer scorecards. Further, she is seeking to strengthen DHMG's communications with other Agency divisions, such as DER, to ensure the successful implementation of FHFA's directives, including SAI.

Our review indicates that the monthly servicer scorecards are high-level summaries that, by themselves, do not present a complete picture of servicer performance. For example, a given servicer's scorecard would not reveal its poor implementation of foreclosure alternatives, such as short sales and loan modifications, or other such conduct; but such information is contained in the reports that the Enterprises compile to monitor their servicers' compliance with SAI's various requirements. DHMG, however, does not routinely receive these reports. Thus, vital information about the servicers' failure to comply with SAI's various requirements may have escaped the Agency's attention.

In any event, DHMG has not determined whether the servicers are complying with SAI or if the initiative is achieving its intended purposes: to improve servicer performance and limit the Enterprises' financial losses. Finally, there is no indication that DHMG sought or obtained information regarding any efforts by the Enterprises to address these issues.

We believe that, in order to ensure the success of its program, the Agency must actively monitor the Enterprises' oversight and enforcement of the provisions of SAI at the servicer level.

## CONCLUSION .......................................................................

FHFA's establishment of SAI in 2011 was a proactive effort to address widespread deficiencies in servicer management of delinquent mortgages. However, DHMG did not develop and implement a process to determine whether servicers were complying with the numerous requirements contained in the SAI-related servicing guidelines and meeting related performance goals. Moreover, DHMG does not require the Enterprises to provide certain internal reports and reviews that would likely benefit the division's SAI oversight program.

We believe it is critical that FHFA address this deficiency in its oversight process. Doing so would enable the Agency to identify and understand SAI compliance deficiencies and trends, ensure that corrective action is undertaken, assess the effectiveness of SAI, and make adjustments to the program as needed.

## RECOMMENDATIONS .......................................................

We recommend that DHMG's Deputy Director:

1. Establish an ongoing process to evaluate servicers' SAI compliance and the effectiveness of the Enterprises' remediation efforts;

2. Direct the Enterprises to provide routinely their internal reports and reviews for DHMG's assessment; and

3. Regularly review SAI-related guidelines for enhancements or revisions, as necessary, based on servicers' actual versus expected performance.

# OBJECTIVE, SCOPE, AND METHODOLOGY ................................

## Objective

The objective of this report was to assess FHFA's oversight of SAI.

To achieve this objective we reviewed all publicly available FHFA documents. In addition, we requested SAI-related documents from FHFA and the Enterprises. We interviewed or met with multiple individuals from FHFA, Fannie Mae, and Freddie Mac. Finally, we specifically requested all records maintained pursuant to the SAI charter.

## Scope

This survey covers FHFA's implementation and oversight of SAI during the period of January 1, 2011, through October 31, 2013.

## General Methodology

We evaluated FHFA's oversight of SAI using the principles detailed in the Government Performance and Results Modernization Act of 2010 (GPRMA) and the SAI charter.

In conducting this evaluation, we also considered:

- FHFA's Strategic Plans, Performance Goals, and Performance Measures
- FHFA's Conservatorship Strategic Plans and Scorecards
- Fannie Mae's SAI-Related Servicer Performance Reports
- Freddie Mac's SAI-Related Servicer Performance Reports

This evaluation was conducted under the authority of the Inspector General Act of 1978, as amended, and in accordance with the *Quality Standards for Inspection and Evaluation*, which were promulgated by the Council of the Inspectors General on Integrity and Efficiency. These standards require OIG to plan and perform an evaluation that obtains evidence sufficient to provide a reasonable basis to support the findings and recommendations made in it. We believe that the finding and recommendations discussed in this report meet these standards.

# APPENDIX A .................................................................

## FHFA's Comments on OIG's Findings and Recommendations

 **Federal Housing Finance Agency**

### MEMORANDUM

**DATE:**      February 11, 2014

**TO:**         Richard Parker, Deputy Inspector General for Evaluations
              FHFA Office of Inspector General

**FROM:**     Sandra Thompson, Deputy Director
              Division of Housing Mission and Goals

**SUBJECT:**   Evaluation of FHFA's Oversight of the Servicing Alignment Initiative

This memorandum transmits the Federal Housing Finance Agency's (FHFA) management response to the findings and recommendations contained in the above referenced evaluation report (Report). We appreciate the opportunity to clarify FHFA activities related to the Servicing Alignment Initiative (SAI).

**<u>The Roles of FHFA, the Division of Housing and Regulatory Policy, the Division of Enterprise Regulation and the Enterprises in SAI Oversight</u>**

<u>FHFA and the Enterprises</u>
FHFA serves as the primary regulator for the Enterprises. The legislative authority to oversee the Enterprises does not extend to oversight of the servicers. Consequently, FHFA is not in a position to perform any supervisory activities or directly monitor the servicers. While the Enterprises have negotiated agreements with servicers that allow FHFA's Division of Enterprise Regulation to access some servicer information, this access exists only as an outgrowth of FHFA's regulatory authority over the Enterprises to assure their safe and sound operation.

FHFA, as conservator, has the authority to make decisions affecting the Enterprises. However, the Agency has delegated responsibility for most business decisions back to the Enterprises. Under FHFA's delegation of authority, responsibility for overseeing servicer compliance with Enterprise policies rests with the Enterprises.

<u>The Division of Housing Mission and Goals and the Division of Enterprise Regulation</u>
One of the primary roles of FHFA's Division of Housing Mission and Goals (DHMG), and specifically DHMG's Office of Housing and Regulatory Policy (OHRP), is to maintain an awareness of, review changes to and identify areas for improvement of Enterprise selling and servicing policies. When a need is identified, OHRP works with the Enterprises to develop policy, which is implemented by the Enterprises through changes to their selling and servicing guides.

DHMG's role in policy development is distinctly and intentionally separated from FHFA's supervisory oversight activities. DHMG informs the Division of Enterprise Regulation (DER) of policy changes throughout the policy making process. Based on that information, DER can assess the risks and status of implementation in order to determine the appropriate supervisory approach to the matter at an appropriate future date. This typically results in ongoing monitoring activities to assess the Enterprises' implementation plans and execution, which may then result in onsite examination work. DER followed this process in its oversight of the rollout of SAI.

DER is responsible for supervision of the Enterprises to ensure they operate in a safe and sound manner. As OIG states in its Report, DER reviewed and found that Enterprise controls over SAI requirements were adequate. The servicer deficiencies noted in the OIG Report are all deficiencies that were identified by the Enterprises as part of their existing compliance function.

**DHMG has and continues to fulfill its role in directing the Enterprises' policy and programmatic changes and improvements**

In addition to monthly servicer scorecards reviewed by DHMG's Deputy Director, OHRP subject matter experts receive and review specific monthly and quarterly reports from the Enterprises. This information, along with feedback from meetings with the Enterprises, stakeholders and other federal regulators, is used as a basis to determine if additional policy work is necessary. A few examples that demonstrate the effectiveness of this process include changes to Short Sale and Deed-in-Lieu policies and creation of the Streamlined Modification Program. These loss mitigation enhancements were made after the original implementation of SAI.

- **Short Sale and Deed-in-Lieu Policies** – After completion of an overhaul of the home retention option, standard modification, it became apparent that the servicer struggled to offer borrowers a suitable liquidation alternative. Across the two Enterprises there were four short sales and two deed-in-lieu offerings, each with their own distinct sets of rules and terms. FHFA applied the general SAI principles of streamlining and simplifying to these programs to make it easier and faster for borrowers to resolve their delinquencies. These changes were made because OHRP has an established process to identify where policy changes are needed.

- **Streamlined Modification Initiative** – Announced on March 27, 2013, this new modification program requires no borrower hardship or financial documentation. FHFA worked with the Enterprises to introduce the new program after conducting continuous assessment of Standard Modification uptake and determining that a uniform approach and a streamlined borrower application with simpler rules was not sufficient to assist all delinquent borrowers. In fact, the borrower challenges associated with compiling the required documentation was the persistent problem that needed to be addressed. Removing the administrative barriers associated with document collection and servicer evaluation enabled significantly more borrowers to access the available options to keep their homes.

OHRP and the Enterprises continued SAI policy discussions throughout 2013, which culminated in changes to Enterprise servicing guides to adapt relevant parts of SAI guidance to new Consumer Finance Protection Bureau (CFPB) regulations.

OIG Report Footnotes

We appreciate that, in Footnote 17, OIG refers to the GPRA Modernization Act of 2010 (GPRAMA). The actual performance goals (2.1.2 and 2.1.3) and means to assess them related to foreclosure prevention and loan modification activities (SAI) are contained on pages 17 and 18 of FHFA's Annual Performance Plan for 2014. DHMG reports on these goals on a quarterly basis as required by GPRAMA.

In Footnote 20 the Report infers that DHMG determined SAI was a success based solely on delinquency data provided by the Enterprises when, in fact, DHMG was noting that the data was one indicator perceived to show SAI was successful. DHMG's actual response to the question of whether it considered SAI a success, in full stated: "Yes. In August 2013, both Enterprises provided FHFA with one year statistics. The data demonstrated that for both Enterprises all major delinquency categories were reduced with the implementation of SAI. FHFA continues to meet with the Enterprises on a weekly basis to review and improve upon the SAI policies. Another perceived success measure is that both the upcoming CFPB Regulation X servicing rules and the AG settlement rules are aligned with existing SAI policy."

Report Recommendations and FHFA Responses

OIG recommends that DHMG's Deputy Director:

1. Establish an ongoing process to evaluate servicers' SAI compliance and the effectiveness of the Enterprises' remediation efforts.

   **FHFA Response**: FHFA partially agrees with this recommendation. DHMG, through its OHRP servicing team, will continue current practices which include periodic review of reports and dialogue with the Enterprises, stakeholders, other regulatory agencies and DER to determine if and when additional changes to servicing policies are necessary. DER will continue to monitor the Enterprises' controls over servicer compliance with their guides either as part of its overall examination plan or through targeted monitoring. FHFA will provide to OIG copies of SAI steering committee meeting notes by February 15, 2015.

2. Direct the Enterprises to provide routinely their internal reports and reviews for DHMG's assessment.
   **FHFA Response**: FHFA partially agrees with this recommendation. As stated above, DHMG management and subject matter experts review certain reports relevant to servicing activity, many of which are contained in a larger set of reports the Enterprises submit to DER. DHMG will continue its practice of reviewing reports in combination

with other activities related to servicing policy. FHFA will provide to OIG an updated list of the reports DHMG reviews by February 15, 2015.

3. Regularly review SAI related guidelines for enhancements or revisions, as necessary, based on servicers' actual versus expected performance.

**FHFA Response**: FHFA partially agrees with this recommendation. The fact that a servicer does not comply with a guideline does not mean the guideline is problematic. DHMG will continue to engage in policy review as necessary and consider implications of servicer performance when reviews are completed by the Enterprises. FHFA will provide to OIG copies of SAI steering committee meeting notes by February 15, 2015.

# APPENDIX B.........................................................................

## OIG's Response to FHFA's Comments

Although FHFA states that it "partially agrees" with our three recommendations, we believe the response indicates that the Agency does not plan to alter substantively its limited oversight of SAI.  FHFA claims that it lacks authority to assess servicer compliance with SAI – a program that it established in order to improve servicer performance and thereby limit the Enterprises' financial losses.  We find FHFA's arguments for maintaining its current approach to be unpersuasive as described below.

### OIG's Response to FHFA Comments on its Lack of Regulatory Authority Over Servicers

FHFA's position is that it does not directly regulate the Enterprises' servicers, and that it has delegated to the Enterprises the responsibility to ensure that their servicers comply with SAI.

We understand that FHFA does not directly regulate servicers, but that fact is irrelevant to the oversight deficiencies we identify in this report.  FHFA established SAI and prescribed the standards that servicers must meet in fulfilling their contracts with the Enterprises.  FHFA's delegation of day-to-day SAI implementation responsibilities to the Enterprises does not absolve FHFA of its responsibility to determine whether SAI is having the desired impact on servicer performance.

### OIG's Response to FHFA's Comments on DHMG's and DER's Roles in SAI Oversight

FHFA has narrowly defined the roles of DHMG and DER with respect to SAI.  According to FHFA, DHMG's role was to develop SAI, the implementation of which was left to the Enterprises, while DER's role is limited to reviewing the Enterprises' controls over SAI.  Thus, no unit within FHFA is monitoring the servicers' compliance with SAI and determining whether it is having the desired impact on servicer performance.

### OIG's Response to FHFA's Planned Actions on the Draft Report's Recommendations

*Recommendation 1*:  FHFA's response indicates that it plans to continue its current oversight approach with regard to SAI.

*OIG Response:*  As described in the report, we believe FHFA's ongoing activities are insufficient.  For example, the Agency has not compared servicer performance against the SAI work stream goals, even though SAI has been in effect for nearly three years.  Moreover, FHFA has offered no plan for assessing the effectiveness and success of SAI.

*Recommendation 2*:  The Agency states that it receives certain Enterprise reports relevant to servicing activity and will continue to review them; it appears unwilling to review the additional reports we have identified.

*OIG Response*:  As we stated, the reports to which FHFA confines its oversight are insufficient to the task.  The additional reports we identified are important; for example, they highlight significant servicer compliance deficiencies, such as failing to respond timely to requests for foreclosure alternatives.  We believe FHFA should obtain these reports so that it may effectively evaluate servicers' SAI compliance and, by extension, the impact of SAI.

*Recommendation 3*:  FHFA stated that the fact a servicer does not comply with a guideline does not mean the guideline itself is problematic.

*OIG Response*:  We agree that a servicer's failure to comply with a guideline does not necessarily mean that the guideline is problematic.  However, we believe that by reviewing the guidelines and servicer compliance FHFA may be better able to determine whether any enhancements to the guidelines are necessary.

# ADDITIONAL INFORMATION AND COPIES................................

For additional copies of this report:

- Call:  202–730–0880
- Fax:  202–318–0239
- Visit:  www.fhfaoig.gov

To report potential fraud, waste, abuse, mismanagement, or any other kind of criminal or noncriminal misconduct relative to FHFA's programs or operations:

- Call:  1–800–793–7724
- Fax:  202–318–0358
- Visit:  www.fhfaoig.gov/ReportFraud
- Write:

  FHFA Office of Inspector General
  Attn: Office of Investigation – Hotline
  400 Seventh Street, S.W.
  Washington, DC  20024